**UNITED STATES of America**

v.

**Francis P. SALEMME, et al.**

**United States of America**

v.

**John Martorano.**

**Nos. CR. 94–10287, CR. 97–10009.**

United States District Court,
D. Massachusetts.

Feb. 13, 1998.

See also 164 F.Supp.2d 86 and 91 F.Supp.2d 141.

prejudice concerning any party. 28 U.S.C. § 455(b)(1). It also requires that a judge decide matters based solely on the evidence presented in judicial proceedings. This means, among other things, that a judge may not preside if he: (a) "participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy," § 455(b)(4); (b) has "personal knowledge of disputed evidentiary facts concerning the proceeding," § 455(b)(1); or (c) knows he or she is "likely to be a material witness in the proceeding," § 455(b)(5)(iv). If any of these circumstances exist, the judge must disqualify himself even if the parties agree that it would be desirable for him to continue to preside. *United States v. Chantal,* 902 F.2d 1018, 1023 (1st Cir. 1990).

Randolph Gioia, Boston, MA, Anthony M. Cardinale, Cardinale & DiMauro, LLC, Boston, MA, for Robert P. DeLuca.

MaryEllen Kelleher, Law Office of Richard Egbert, Boston, MA, John Mitchell, Law Office of John Mitchell, New York City, Anthony M. Cardinale, Cardinale & DiMauro, LLC, for Francis P. Salemme.

Richard M. Egbert, Boston, MA, Kenneth J. Fishman, Fishman, Ankner & Horstman, LLP, Boston, MA, Kimberly Homan, Sheketoff & Homan, Boston, MA, for Stephen J. Flemmi.

Sean E. Curran, Manchester, NH, for George Kaufman.

### MEMORANDUM AND ORDER

WOLF, District Judge.

#### I. *Summary*

■ Federal law requires that a presiding judge not have a personal bias or

■ In addition, a judge must "disqualify himself in any proceeding in which his impartiality might reasonably be questioned." § 455(a). " 'Disqualification [under § 455(a) ] is appropriate only if the facts provide what an objective, knowledgeable member of the public would find to be a *reasonable* basis for doubting the judge's impartiality.' " *In re Allied–Signal, Inc.,* 891 F.2d 967, 970 (1st Cir.1989), *cert. denied sub nom. ACW Airwall, Inc. v. United States District Court for District of Puerto Rico,* 495 U.S. 957, 110 S.Ct. 2561, 109 L.Ed.2d 744 (1990) (quoting *In re United States,* 666 F.2d 690, 695 (1st Cir. 1981)) (emphasis in original).

[Section] 455(a) is triggered by an attitude or state of mind so resistant to fair and dispassionate inquiry as to cause a party, the public, or a reviewing court to have a reasonable grounds to question the neutral and objective character of the judge's rulings or findings ... a

high threshold is required to satisfy this standard. Thus, under § 455(a), a judge should be disqualified only if it appears that he or she harbors an aversion, hostility, or disposition of a kind that a fairminded person could not set aside when judging the dispute.

*Liteky v. United States,* 510 U.S. 540, 557–58, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994) (Kennedy, J., concurring).

"The task of applying the objective standard to the facts grants a judge a degree of discretion in disqualification decisions under section 455(a) that is not present in section 455(b) decisions." S. Hoekema, *Questioning the Impartiality of Judges: Disqualifying Federal District Court Judges Under 28 U.S.C. § 455(a),* 60 Temp. L.Q. 697, 727 (1987) (footnotes omitted). Accordingly, the Court of Appeals for the First Circuit allows the district judge "a range of discretion" in deciding whether a reasonable, objective person would question his impartiality and reviews that decision only for abuse of discretion. *In re Allied–Signal,* 891 F.2d at 970.

There are competing considerations which at times must be weighed by a presiding judge in deciding whether to recuse himself under § 455(a). As the Court of Appeals for the First Circuit has stated:

> [W]hen considering disqualification, the district court is *not* to use the standard of "Caesar's wife," the standard of mere suspicion (citation omitted). That is because the disqualification decision must reflect *not only* the need to secure public confidence through proceedings that appear impartial, *but also* the need to prevent parties from too easily obtaining the disqualification of a judge, thereby potentially manipulating the system for strategic reasons, perhaps to obtain a judge more to their liking.

> \* \* \* \* \* \*

> [Therefore,] the judge must … tread cautiously, recognizing, on the one hand, the great importance to the judicial institution of avoiding any appearance of partiality, while simultaneously remaining aware of the potential injustices that may arise out of unwarranted disqualification.

*In re Allied–Signal,* 891 F.2d at 970 (emphasis in original).

If the only basis for recusal is an appearance of partiality under § 455(a), the parties may, after "full disclosure on the record of the basis for disqualification," waive this ground for recusal. § 455(e). The government and the defendants provided such waivers with regard to the information I described in detail on December 4, 1997, including my work in the United States Attorney's Office from 1981 to 1985, and my resulting association with a number of the witnesses in the pending hearings on defendants' motions to dismiss and suppress.

As described below, the evolution of events in this case caused me on January 21, 1998 to raise the question whether I should now recuse myself under § 455(a) or (b) because of a December 21, 1984 memorandum concerning a conversation I had with then Assistant Attorney General Stephen Trott (Exhibit A hereto), which I discovered the night before. I have since found an October 15, 1984 memorandum relating to the prosecution of Vincent Piro (Exhibit B hereto), which is also relevant to this inquiry.

Beginning on January 21, 1998, I have at several conferences consulted the parties concerning the questions raised relating to my possible recusal.[1] That discussion has

---

1. The government initially suggested the possibility of asserting a deliberative process

been helpful, but not decisive. The defendants have stated that they believe that my disqualification is not necessary or appropriate under either § 455(a) or (b), and that they will again waive any possible ground for recusal under § 455(a).

The government has not expressed a definitive view on the pending recusal issues. It has described a number of possible concerns. The government has also encouraged me to consider the issues in the first instance and to require the government to declare whether it requests my recusal only if it is not clear to me whether my disqualification is appropriate. This memorandum is written in response to that request.

In summary, the recusal questions, particularly the issue of whether I should be disqualified under § 455(a), must be analyzed in the context of the long history of this case, and with an understanding of the issues to be litigated and of my prior employment by the Department of Justice. Section II of this memorandum describes what I perceive to be the relevant facts.

Section III describes what I understand, without the benefit of briefing by the parties, to be the applicable legal standards and my present, still preliminary, views on how they apply in this case. As described in detail, I do not believe that I have any personal bias or prejudice against any party. Thus, my disqualification is not required under that prong of § 455(b)(1). *See* § III. A.

In contrast to my visceral reaction, expressed to the parties on January 21, 1998,

I am not now inclined to believe that the December 21, 1984 memorandum requires my recusal under § 455(b). *See* § III. B. More specifically, that memorandum indicates that, when he spoke to me, the Assistant Attorney General had already decided to authorize the application for the 1984–85 electronic surveillance now subject to defendants' motion to suppress. He did not solicit or receive advice on its merits from me. Rather, he was calling to complain about the Assistant United States Attorney who prepared the application and the quality of his draftsmanship. Thus, it does not now appear to me that I have personal knowledge of a disputed evidentiary fact concerning the 1984–85 electronic surveillance. Nor has any party stated that I am likely to be called to testify with regard to my conversation with the Assistant Attorney General or the memorandum concerning it.

Similarly, at this time it appears to me that the October 15, 1984 memorandum regarding the Piro prosecution does not indicate that I have personal knowledge of a disputed evidentiary fact in this case. *See* § III. C. I now realize that I dealt with Federal Bureau of Investigation ("FBI") Special Agent John Morris when I was the Deputy United States Attorney, from 1981 to 1985, and discussed with colleagues the suspicion that he had said something to former FBI Special Agent Dennis Condon that may have compromised the Piro investigation. I believe, however, that this information does not impair my ability to assess, if necessary, the credibility of any testimony Messrs.

privilege, or some other privilege, which would bar public disclosure of the documents which present the pending recusal questions. Both the government and the defendants requested that discussions of those documents be conducted in proceedings closed to the public until the issues of possible privilege could be resolved. I agreed and so stated in a

public session on January 21, 1998. The government has now decided not to assert any possible privilege concerning the documents, at least in connection with the proceedings relating to my possible recusal. The government, the defendants, and I agree that this issue should now be addressed in public proceedings.

Morris or Condon may provide in this case. Moreover, I do not recall any suspicion of defendant James "Whitey" Bulger concerning the Piro matter. Nor, according to the FBI's interview report, does John Pappalardo, who was the lead prosecutor in the Piro case.

Finally, with regard to § 455(b), the FBI 209 report of statements made by defendant Stephen Flemmi on August 8, 1983, (Exhibit C hereto) does not cause me to be biased or prejudiced against Mr. Flemmi. Nor, as I now perceive it, does the 209 give me personal knowledge of any disputed evidentiary fact. *See* § III. D.

In addition, at this time, it appears to me that with regard to § 455(a), the waivers provided by the government and defendants in December 1997 were valid and binding with regard to the matters then disclosed, and that the appropriate focus now is on the recent disclosures. *See* § III. E. In any event, even if a broader view is taken, it now seems to me that it may be debatable whether a reasonable person, fully informed of all of the relevant facts, would question my impartiality, but this question is at least within the range of my discretion to decide. I am preliminarily inclined to find that such a reasonable person would not question my impartiality. If this is a permissible and appropriate conclusion, I am inclined to continue to preside in order to facilitate the progress of this case, rather than to recuse myself as I often do when a legitimate issue of possible disqualification is raised at the outset of a case.

I am, however, interested in the parties' views on these § 455(a) issues, among others. If the parties agree that this is a close question on which I have legitimate discretion, I wish to have their advice as to how I should exercise that discretion. I also want to know whether if the only issue is a possible appearance of partiality—rather than any § 455(b) actual impediment to my ability to continue to preside fairly—they again wish to waive this ground for my disqualification.

Accordingly, it will be necessary for the parties to state and explain their positions on the relevant issues before I decide whether to continue to preside in this case. I am now ordering the parties to address the questions concerning my possible disqualification in the context of the following facts and legal considerations, as well as any others they deem appropriate. After their submissions are received, a hearing will, if necessary, be held concerning my possible recusal.

## II. *Factual History*

As the parties have known since the inception of this case, and as I have discussed on the other occasions on which I have raised questions concerning my possible recusal,[2] prior to becoming a judge I served in the Department of Justice. In 1974, I was a Special Assistant to the Deputy Attorney General. From 1975 to 1977 I was a Special Assistant to the Attorney General. From November 1981 to April 1985 I was the Deputy United States Attorney for the District of Massachusetts and the Chief of the Special Investigations Unit in that office, which was responsible for the prosecution of political corruption

---

**2:** As this case has developed, I have raised issues concerning my possible recusal as soon as I have discerned them because I do not want to preside in this, or any case, if my participation is impermissible or inappropriate, and I also want to minimize the risk that a disappointed litigant will later have a reasonable basis for claiming that decided issues should be reopened because my participation was improper. *See, e.g.,* December 4, 1997 Tr. at 58.

cases (the "SIU" or "Public Corruption Unit").

While I was Deputy United States Attorney, William F. Weld was the United States Attorney. Jeremiah O'Sullivan was the Chief of the Organized Crime Strike Force (the "Strike Force"), as well as a recent predecessor of mine as the head of the Political Corruption Unit. In that period, the Strike Force, and its attorneys, were not part of the United States Attorney's Office. The Strike Force and the United States Attorney's Office did, however, interact at times.

After beginning work together in November 1981, Mr. Weld and I received joint briefings on many matters, including some Organized Crime matters. In addition, initially we often worked on matters together. As the FBI reports Mr. Weld stated when interviewed on July 29, 1997, that as Chief of the Strike Force, Mr. O'Sullivan generally dealt directly with Mr. Weld as United States Attorney, rather than reporting to him through me as Deputy United States Attorney. In addition, over time, my joint activities with the United States Attorney diminished as I increasingly focused on supervising the Public Corruption Unit and personally conducting grand jury investigations and prosecutions.

As I explained on December 4, 1997, I did discuss certain public corruption matters with Mr. O'Sullivan, who had recently headed the SIU. December 4, 1997 Tr. at 45-6. In addition, I played a role in developing an investigation of possible corruption in the Boston Police Department which was transferred from the SIU to the Strike Force. Assistant United States Attorney Robert Cordy and Strike Force Attorney Diane Kottmyer were primarily responsible for any necessary coordination concerning that investigation. The summaries of Mr. O'Sullivan's logs and calendar entries furnished to me and defense counsel by the government on February 5, 1998 [3] indicate that he and I also discussed that investigation on several occasions. Such discussions would have been consistent with our relative roles and I assume that they occurred. I also assume for present purposes that the other occasional telephone conversations and meetings reflected on Mr. O'Sullivan's records occurred.[4]

The Organized Crime Drug Enforcement Task Force ("OCDETF") was established during my tenure in the United States Attorney's Office. It was located in the District of Massachusetts, but its jurisdiction covered several states. Its Coordinator did not, as a practical matter, report to the United States Attorney through me as Deputy United States Attorney. I did not participate in reviewing any applications for electronic surveillance prepared by the OCDETF to the best of my recollection.

In August 1984, I was informed that I had tentatively been selected to be nominated by the President for appointment to the United States District Court. That process consumed a great deal of my time and attention. I was nominated in October 1984, but not confirmed prior to the

---

3. As stated orally at the conference on February 4, 1998, these documents are subject to ¶ 9 of the June 26, 1997 Order (the "June 26, 1997 Protective Order") as modified by the December 29, 1997 Order at ¶ 4.

4. Mr. O'Sullivan's telephone logs reflect that we spoke on the telephone 23 times in the approximately three and a half years that I worked in the United States Attorney's Office. His calendar entries reflect that we met 33 times in that period, including several times for lunch and once for a Celtics game. *See also* December 4, 1997 Tr. at 46–47.

Presidential election in November. The issue of my renomination and, particularly, my potential confirmation required my attention after the 1984 election. My selection to become a member of the District Court also limited the appropriate range of my activities on behalf of the United States Attorney's Office. Thus, after my selection, my activities on behalf of the United States Attorney's Office were largely devoted to supervising the work of the Public Corruption Unit and writing an appellate brief. My nomination was confirmed in April 1985, and I left the United States Attorney's Office that month. My working files remained in the United States Attorney's Office. I did, however, retain a personal, monthly chronological file of letters and memoranda that I wrote.

When I became a judge, it was my practice not to preside in any case that was indicted or under investigation while I was in the United States Attorney's Office. Those cases were generally identified by the United States Attorney's Office when indictments were returned and they were not assigned to me. Over time, the cases requiring my recusal based generally on my service as Deputy United States Attorney diminished in number and then disappeared. There continued, however, to be cases which raised questions concerning my possible disqualification based on particular facts, which I addressed on their individual merits.[5] When this case was indicted, the government did not identify it

as one that was being investigated while I was Deputy United States Attorney.

The nature and dimensions of the charges in this case were dramatically different when it was originally indicted than they are today. The original indictment was returned on October 25, 1994, against one defendant, Robert DeLuca. In five pages it charged DeLuca with conspiring to violate the Travel Act, 18 U.S.C. § 1952, and with a substantive violation of that statute based upon his alleged attendance at a Mafia induction ceremony held at 34 Guild Street, Medford, Massachusetts on October 29, 1989. The timing of the indictment was evidently influenced by the fact that the five year statute of limitations on these offenses was about to expire. *See* 18 U.S.C. § 3282. The DeLuca case was randomly assigned pursuant to the District Court's established procedures. It was drawn to me.

On January 10, 1995, the government obtained a 91–page superceding indictment. This First Superceding Indictment added six defendants—Bulger, Flemmi, George Kaufman, Francis P. Salemme, Francis P. Salemme, Jr., and James Martorano; John Martorano was not then named as a defendant. The First Superceding Indictment also radically altered the charges in the case. The new charges included, among others, an alleged RICO conspiracy lasting more than 30 years and a lengthy conspiracy to extort bookmakers

---

5. For example, in *United States v. McCallion*, Cr. No. 95–10243, the government disclosed that I had questioned a prospective witness in a grand jury proceeding that led to an indictment of his father-in-law, which I personally prosecuted. Neither the government, the defendants, nor I viewed my disqualification as necessary or appropriate in that case.

However, over the government's objection, at the outset of the matter, I did disqualify myself in a case being prosecuted by an Assistant United States Attorney whose wedding I

had recently performed. *See United States v. Sawyer*, Cr. No. 94–10168–MLW (D. Mass. September 2, 1994 Memorandum and Order). In the process, I declined the government's request that I allow the prosecutor to be replaced and continue to preside myself because, although that was a permissible option, I did not want to "abet the mistaken public perception that the government can in Massachusetts influence who will preside in a particular case." *Id.* at 15.

and drug dealers. DeLuca was named in only a fraction of the alleged racketeering acts and substantive charges. The new charges against DeLuca and his codefendants could have been brought as a separate indictment, which would have been randomly assigned to a member of the District Court. However, as those charges were brought in a superceding indictment in an existing case, they were, in accordance with the District Court's standard and well-known practice, assigned to me.

Prior to January 1995, I had presided in several cases against alleged members of the Patriarca Family of La Cosa Nostra ("LCN") in which the government obtained convictions and, in almost all instances, the imposition of the sentences it requested. Most notably, as a result of random assignments, I presided in two cases involving the prosecutions of LCN members Raymond J. Patriarca, Joseph Russo, Vincent Ferrara, Robert Carrozza, Dennis Lepore, Carmen Tortora, Biagio DiGiacomo, Antonio Spagnolo, Joseph Gioacchini and an LCN Associate, Pasquale Barone. All except Patriarca and Barone received the sentences to which the government and the defendant had agreed in Fed.R.Crim.P. 11(e)(1)(C) binding plea agreements. *See, e.g., United States v. Carrozza,* 807 F.Supp. 156, 157–58 (D.Mass.1992), *aff'd in part, vacated in part,* 4 F.3d 70 (1st Cir.1993), *cert. denied,* 511 U.S. 1069, 114 S.Ct. 1644, 128 L.Ed.2d 365 (1994). After a trial, Barone was sentenced to life in prison. Patriarca, who had not been finally sentenced as of January 1995, ultimately received a ten-year sentence, which although representing an upward departure under the Sentencing Guidelines was significantly less than the life sentence the government was seeking. *See United States v. Patriarca,* 912 F.Supp. 596 (D.Mass.1995).

In addition, in the prosecution of Patriarca and his codefendants, I had issued a then unprecedented decision finding the "roving bug" provisions of 18 U.S.C. § 2518(11)(a) to be constitutional, and denied a motion to suppress the tape-recorded evidence of the Mafia induction ceremony that was intercepted at 34 Guild Street, on October 29, 1989. *See United States v. Ferrara,* 771 F.Supp. 1266, 1319 (D.Mass. 1991). My factual findings and analysis were adopted by the District Court in Connecticut in *United States v. Bianco,* and were affirmed by the Court of Appeals for the Second Circuit in that case. 998 F.2d 1112, 1119–28 (2d Cir.1993), *cert. denied,* 511 U.S. 1069, 114 S.Ct. 1644, 128 L.Ed.2d 364 (1994). The government planned to offer the tape recording of the Mafia induction ceremony as evidence in this case. In January 1995, the government had good reason to believe that it could predict how I would rule on the foreseeable motion to suppress that evidence in this case.[6]

On August 1, 1995, the government obtained a Second Superceding Indictment that added John Martorano as a defendant.[7] John Martorano had been a fugitive from RICO charges brought in 1979 against Howard Winter, himself, and others relating to horse race-fixing scheme which was, in effect, alleged to be a racketeering act of a RICO enterprise known as

---

**6.** The disclosure that Angelo Mercurio was a government informant when he attended the induction ceremony is a fact that was not known to me when I denied the motion to suppress in 1991. Defendants contend that it is a material development which entitles them to suppression of the evidence of that ceremony in this case. This is one issue to be litigated in the pending proceedings.

**7.** The Second Superceding Indictment also deleted as defendants George Kaufman and Francis P. Salemme, Jr., each of whom had died.

the Winter Hill Gang. After he was apprehended, John Martorano's case was assigned to District Judge Reginald Lindsay. On July 24, 1995, over the government's objection, Judge Lindsay dismissed the case against John Martorano, without prejudice, because of a violation of the Speedy Trial Act, 18 U.S.C. § 3161. Rather than attempting to reinstitute the dismissed charges, the government brought new charges against Martorano in this case, including allegations that he participated in the race-fixing scheme on behalf of a different RICO enterprise, the amalgamation of the Winter Hill Gang and the Patriarca Family charged here. Thus, I became responsible for presiding in the case against John Martorano.

On May 21, 1996, the government obtained what it called a Third Superceding Indictment, with two parts, one of which included only the charges against John Martorano. The government characterized this as a "bifurcation" of the Second Superceding Indictment. Neither counsel nor the court was familiar with any precedent for such a severance of charges by a grand jury within a single indictment. I, therefore, deemed the charges against John Martorano to constitute a separate indictment, and had it given a separate case number. I did not, however, have that indictment randomly reassigned. With the consent of the parties, in the interest of efficiency, I consolidated for pretrial purposes the case against John Martorano and the case against his former codefendants.

After I indicated that motions to dismiss the Third Superceding Indictment for failure to allege properly certain elements of a RICO offense might be meritorious, on July 2, 1996, the government obtained a Fourth Superceding Indictment, which was intended to cure the alleged defects in pleading. I subsequently conducted lengthy hearings on some of defendants' many remaining motions to dismiss and to suppress.

As of March 1997, I had denied the defendants' motion to dismiss the Fourth Superceding Indictment and many of the alleged Racketeering Acts. *See United States v. Salemme*, 1997 WL 37530, *1–6 (D.Mass. January 13, 1997). I also orally announced my decision denying the motion to suppress certain electronic surveillance conducted by the Massachusetts State Police although I found that the government had violated state law by obtaining in the wrong county the court order authorizing that electronic surveillance, January 29, 1997 Tr. at 1–7, 26, and had not had the resulting tape recordings sealed in the time required by federal law. February 18, 1997 Tr. at 3–52.

In addition, on several occasions I informed the parties of my inclination to exclude the testimony of Hugh Shields and other evidence concerning the 1967 murders of Edward, Walter, and William Bennett, and Richard Grasso, which were charged for the first time in the Third Superceding Indictment as racketeering acts of Flemmi and Salemme, because the government had misused the grand jury to obtain evidence to strengthen the RICO charges previously alleged. This issue may have significant practical consequences for this case. If Flemmi and/or Salemme are convicted but not held accountable at sentencing for any of the four murders, it appears that the Guideline ranges for their sentences may be reduced from life imprisonment to as little as ten to thirteen years for Flemmi and eight to ten years for Salemme. As I have told the parties, however, I have not issued a decision on this matter, which I have intended to be the subject of a written memorandum and order.

In March 1997, the defendants moved for evidentiary hearings on their motions to suppress certain electronic surveillance and for disclosure of whether certain individuals, including Bulger and Mercurio, had been FBI informants at the time that they were treated as targets or individuals expected to be intercepted in the applications for court orders authorizing the electronic surveillance at issue. In the course of the hearings on these motions, I realized that Flemmi had been an FBI informant and also named, with Bulger and Kaufman, as a target of electronic surveillance conducted by the Drug Enforcement Administration ("DEA") and the FBI from December 1984 to March 1985. *See United States v. Salemme*, 978 F.Supp. 343, 350-51 & n. 3 (D.Mass. 1997). After Flemmi confirmed this fact, which had been known by the prosecutors since 1995, it was disclosed to his codefendants. *Id.*

The government strenuously opposed the motions for evidentiary hearings and the request that it be required to confirm or deny whether Bulger, Mercurio and others had been FBI informants. *Id.* at 345. Because the motions involved issues relating to the confidentiality of informants and it was uncertain how they would be decided, at the request of the parties, the submissions concerning them were sealed and several hearings closed to the public were conducted. *Id.*

On May 22, 1997, I issued a Memorandum and Order deciding that:

[T]he defendants are entitled to evidentiary hearings on their motions to suppress electronic surveillance: (a) jointly conducted in 1984 and 1985 by the Drug Enforcement Administration ("DEA") and Federal Bureau of Investigation ("FBI"), which targeted Bulger, Flemmi, and George Kaufman, among others; (b) conducted on October 29, 1989, by the FBI, at 34 Guild Street, Medford,

Massachusetts; and (c) conducted on December 11, 1990, by the FBI, at the Hilton Hotel in East Boston, Massachusetts. In connection with these hearings, the defendants are entitled to discovery concerning whether Angelo "Sonny" Mercurio, Robert Donati, Bulger, Flemmi, Anthony St. Laurant, Kenneth Guarino, and perhaps others were at relevant times secretly providing information to the government.

*Id.* at 345-46. Because I was told that the government might dismiss the case rather than confirm or deny the existence of a cooperating individual, or ask that it be held in civil contempt so that it could appeal the Order, the May 22, 1997 decision was temporarily sealed. *Id.* at 346.

The government subsequently confirmed that Bulger, who was and remains a fugitive, was an FBI informant during the period he is charged in this case with committing serious crimes; conceded that there was a proper basis for the court to have ordered evidentiary hearings on the defendants' motions to suppress electronic surveillance; at the direction of the Acting Deputy Attorney General declined to obey the Order that it confirm or deny whether anyone but Bulger was an informant; and asked for reconsideration of that Order. *See United States v. Salemme*, 978 F.Supp. 364, 365 (D.Mass. June 6, 1997). The May 22, 1997 Memorandum and Order was unsealed and public proceedings on these issues commenced. *Id.* at 366.

In brief summary, the motion to reconsider was denied. *Id.* The Acting Deputy Attorney General initially declined to obey the order to disclose the status of anyone other than Bulger. *Id.* The defendants moved to have him held in civil contempt and incarcerated. *Id.* at 365. The Acting Deputy Attorney General asked that I instead enter an order of conditional exclusion of the electronic surveillance evidence

so the government could attempt to appeal. *See United States v. Salemme*, 978 F.Supp. 375, 376 (D.Mass. June 13, 1997). I found that the government had not satisfied the requirements for a conditional order of exclusion. *Id.* at 376–77. In an effort to cut the Gordian Knot, however, I ordered Mercurio to appear in court to be questioned concerning whether he was an FBI informant when he attended the Mafia induction ceremony on October 29, 1989. *Id.* at 379. I also required the other individuals at issue, except Donati who was dead, to appear to respond to similar questions. *Id.*

On June 18, 1997, Mercurio testified that he was cooperating with the government in connection with the October 29, 1989 LCN induction ceremony. *United States v. Salemme*, 978 F.Supp. 379, 381 (D.Mass. June 19, 1997). In response to a renewed Order, *id.* at 385, the Acting Deputy Attorney General revised his refusal to address Donati's status and represented that he had not been an informant. *United States v. Salemme*, 978 F.Supp. 390, 391 (D.Mass. June 27, 1997). I decided to defer addressing the motion to suppress the December 11, 1991 electronic surveillance conducted at the Hilton Hotel and thus took no action on defendants' motion to hold the Acting Deputy Attorney General in civil contempt to the extent that it related to that electronic surveillance. *Id.*

On June 25, 1997, Flemmi filed an affidavit intended to respond to certain representations made by the government concerning his status as an informant. Among other things, Flemmi asserted that FBI Supervisory Special Agent Morris had told him and Bulger that they could be involved in any criminal activities short of murder and would be protected by the FBI. He also claimed that as part of his continuing relationship with the FBI he was specifically informed of the date his indictment in this case was to be returned so he could flee if he chose to do so.[8] Flemmi had previously asserted that in 1991 Mercurio had been given prior notice of his indictment so he could flee.[9] *See* April 27, 1997 Flemmi Affidavit, ¶ 4.

On June 26, 1997, I ordered that the government produce certain documents and information which was relevant to the forthcoming evidentiary hearings on the motions to suppress and to Flemmi's charges. *United States v. Salemme*, 978 F.Supp. 386 (D.Mass. June 26, 1997). The required discovery included, among other things: virtually all of Flemmi's FBI informant file, *id.* at 387; the documents relied upon by FBI Special Agent John Michael Callahan, Chief Division Counsel for the Boston Division of the FBI, in concluding that "Flemmi's control agents were obviously aware over the years from what Flemmi reported that he was engaged in illegal gambling and LCN policymaking" and that such agents " 'at least tacitly authorized [his] participation,' " *id.* (citations omitted); comparable records regarding Bulger, *id.;* and documents and informa-

---

8. Flemmi was arrested on January 5, 1995, five days before he was indicted. Evidently an arrest warrant was obtained because the government feared Flemmi was about to flee. Although warrants for their arrest were also obtained prior to the January 10, 1995 indictment of Salemme and Bulger, the FBI was unable to find either of them until Salemme was apprehended in Florida in August 1995. As indicated earlier, Bulger remains a fugitive.

9. The evidence to date indicates that Mercurio was in Massachusetts on November 14, 1991, the day before his indictment, when he spoke to at least one FBI Special Agent. He was not arrested when he was indicted. Rather, he was a fugitive until he was arrested in Georgia on state drug charges in 1995.

tion tending to show that Department of Justice and/or FBI regulations had not been complied with concerning Flemmi, Bulger, or Mercurio, *id.* at 387–88. The next day the government repeatedly objected to the scope of the discovery order. *See, e.g.,* June 27, 1997 Tr. at 18, 20–21, 24, 28, 36. Generally, the objections were overruled.

The evolution of the case prompted me to inform the parties of possible recusal issues that I discerned. More specifically, in an April 16, 1997 discussion of the 1984–85 electronic surveillance targeting Bulger and Flemmi, I pointed out that: I was then the Deputy United States Attorney; the applicant, Assistant United States Attorney Gary Crossen, would have been under me on the organization chart; I did not then have a role in reviewing applications for electronic surveillance; and that I was not "personally involved" in that electronic surveillance. April 16, 1997 Tr. at 19–20. I said that I had understood that no one thought that my service as Deputy United States Attorney was a reason for me to be disqualified, but stated that if someone felt the foregoing had implications for my participation, the issue should not be overlooked; rather we should deal with it. *Id.* No one pursued this subject.

Similarly, on April 16, 1997, the defendants indicated that they might ask me to reconsider the accuracy of an affidavit submitted by former FBI Special Agent James Ring in the 1991 litigation concerning the intercepted Mafia induction ceremony. *Id.* at 75. I then informed the parties that while in the United States Attorney's Office I worked with Mr. Ring in a public corruption case and in 1995 had appointed him as the monitor of an order I had issued in a civil case—a capacity in which he was, and is, still employed. *Id.* at 76. John Mitchell, Esq., counsel for Salemme, responded that these facts

"raise[d] no problem for the defense." *Id.* The government said nothing. *Id.*

Nevertheless, on June 17, 1997, I raised again with the parties my prior association with Mr. Ring, Mr. Crossen, and several other individuals involved in this case. June 17, 1997 Tr. at 10–23. I asked them to consider the implications of those associations for my possible recusal. Most significantly for present purposes, I described again the nature of my activities in the United States Attorney's Office in 1984, and stated that I was "quite certain that I did not review Mr. Crossen's application for electronic surveillance." *Id.* at 14–15. Assistant United States Attorney Fred Wyshak reminded me that the wiretaps at issue commenced in December 1984. *Id.* at 21. I reiterated that "I was not reviewing matters" at that time, and expressed my appreciation to Mr. Wyshak for bringing that date to my attention. *Id.* After making these disclosures, I told the parties to consider the matter overnight rather than state their positions regarding my possible recusal at that time. *Id.* at 21–22.

On June 18, 1997, I asked the parties whether, on reflection, "anybody had any questions, concerns, or objections about my participation . . . in the case." June 18, 1997 Tr. at 5. No one asked any questions. *Id.* Defense counsel stated that their clients had no objection to my participation. *Id.* The government said the same. *Id.*

On June 27, 1997, I again raised the issue of my possible recusal with the parties because of a document brought to my attention on June 25, 1997. In preparing to produce Flemmi's FBI informant file to him in discovery, the government found an FBI 209 report of a conversation with Flemmi on August 8, 1983. In essence, the 209 states that Flemmi said that I was leaking information concerning an investigation of Gennaro Angiulo and other mem-

bers of the Patriarca Family to an unknown Jewish male, who was married to the sister of Bruce Swerling, and who told everything to someone named Howie Rubin, who told Angiulo. The document also states that Flemmi said that he trusted Mr. O'Sullivan of the Strike Force.

Upon receiving the report, I told the prosecutors that they had done the right thing in bringing it to my attention promptly. June 25, 1997 Tr. at 5. I stated that the allegations were untrue. *Id.* at 4. I asked the government to give the document to the defendants immediately so that everyone could consider it, ask me any questions, and express their views of its implications for my possible recusal. *Id.* at 4–5. I also stated that ultimately this matter should be discussed in a proceeding open to the public. *Id.* at 4.

Issues relating to the report of Flemmi's statements on August 8, 1983 were discussed in the late morning of June 27, 1997, and pursued after lunch. I reiterated my desire to have the report and its implications for my recusal discussed publicly. June 27, 1997 Tr. at 57–58, 63. The defendants and Mr. Wyshak, who was designated to speak for the government, urged me to conduct the discussion in a closed proceeding. *Id.* at 95. Assistant United States Attorney James Herbert expressed some concern about proceeding in a closed session, but deferred to Mr. Wyshak. *Id.* at 99–100. I decided to conduct the colloquy in the lobby, reserving the right to summarize what occurred publicly, or to release the transcript. *Id.* at 100–01.

The government said that although it did not believe § 455(b)(1) was applicable, conceivably someone could claim that I had personal knowledge of a disputed evidentiary fact, particularly the credibility of Flemmi or FBI Special Agent John Connolly, the "handling agent" for Flemmi who wrote the report. *Id.* at 57, 62–63,

66–67. Defense counsel suggested that the government's comments were intended to prompt my recusal after I had made a series of rulings adverse to it. *Id.* at 60. The government responded that it was not trying to engineer a recusal issue, but only seeking to assure that the defendants would not have a basis for attacking any conviction by claiming that I should have been disqualified. *Id.* at 60, 62.

I offered the parties an opportunity to ask me any questions. *Id.* at 103. None were raised. *Id.* I expressed my belief that I had no personal knowledge of any disputed evidentiary fact. *Id.* at 103–04. I also stated that I had no personal bias or prejudice concerning Flemmi or anyone else. *Id.* at 104.

Flemmi and his counsel stated that they were not concerned that I would be biased against him. *Id.* at 108, 110–11. All of the defendants, in essence, agreed, and also stated that they did not believe a reasonable person would question my impartiality. *Id.* at 108–11. In any event, the defendants each waived any objection to my participation in the case on the latter ground. *Id.* at 110–11.

On behalf of the government, Mr. Wyshak stated that I had demonstrated that I was impartial, and the government did not believe a reasonable person would question my impartiality, based on the report. *Id.* at 109. He also expressed the view that I had adequately demonstrated concern for the defendants' rights. *Id.*

Mr. Herbert also stated that the government then saw no reason for my recusal, although it might wish to study the law further. *Id.* at 102. He did not indicate that the government intended to investigate my conduct while serving as Deputy United States Attorney. *Id.* at 102–03.

I decided to wait until after a planned break of a month in the proceedings to

decide whether to unseal the transcript of the colloquy I had just conducted. *Id.* at 113–14. I did this to avoid making a possible error in haste regarding unsealing, *id.*, and to protect the government from the possible public inference that by bringing the report to my attention, it was seeking to prompt the disqualification of a judge who had recently made rulings with which it deeply disagreed, *id.* at 101. Thus, I said I would decide the question of unsealing at some point in the future. *Id.* at 114. Everyone agreed that this was appropriate. *Id.*

On June 27, 1997, I scheduled the evidentiary hearings on the motions to suppress to begin on August 11, 1997.

In July 1997, the Attorney General established a task fore comprised of prosecutors and many FBI agents to investigate the issues generated by the revelations that Flemmi, Bulger, and Mercurio had been FBI informants. In August 1997, the parties agreed that I should read the Executive Summary of the results of that investigation, in part to determine whether it had produced documents and information which should be furnished to the defendants.

The Executive Summary and related documents that I read indicated that, among other things, the FBI had investigated factual matters that might require or prompt my recusal. For example, the FBI reported that Mr. Weld stated that I was not likely to have been involved in any discussion relating to the 1984–85 electronic surveillance targeting Bulger and Flemmi. Consistent with this, Mr. Crossen reportedly told the FBI that he did not recall discussing that matter with me.

In addition, Mr. Weld reportedly told the FBI that Mr. O'Sullivan reported directly to him on Strike Force matters rather than through me. The interview report indicates that Mr. Weld also said that he had no recollection of discussing the Angiulo prosecution memorandum with me, although I would have had access to it.

The FBI also interviewed the woman who was referenced in Flemmi's August 8, 1983 complaint about me. She said that the "unknown Jewish male" Flemmi was describing was her partner Stephen Ricci, who was not Jewish. She did not, according to the report of her interview, list me as among Ricci's friends. The report does not state that she was asked about me, although Flemmi's allegations concerning me were the evident reason for the interview. The Executive Summary, however, informed the Attorney General that her task force had found that it was "apparent that these FBI informants [Flemmi and Bulger] had their own network of sources in law enforcement." The list of "possible law enforcement leaks" included the following:

15. Then AUSA (now U.S. District Judge) Mark Wolf and a female who works for the USAO.

On August 8, 1993, a CI advised that leaks were coming from Howie Rubin's girlfriend, who worked for the USAO and AUSA Mark Wolf. The source advised that Wolf is very close to an unknown Jewish male and this unknown Jewish male was identified as Stephen Ricci. Ricci died in August of 1993.

This entry does not identify Flemmi as the "CI" or "source." Although the prosecutors in this case were consulted by the task force on various matters, and participated in some of the interviews, the Executive Summary does not disclose or describe the June 25 and 27, 1997 colloquies concerning Flemmi's statements.

On September 17, 1997, in an *ex parte* session with the government that was convened for other purposes, I mentioned this entry in the Executive Summary and stat-

ed that if the government had revised its view and now felt that Flemmi's allegations merited my recusal, that issue should be dealt with before we resumed lengthy evidentiary hearings. September 17, 1997 Tr. at 12–13. Mr. Wyshak assured me that I was not under investigation. *Id.* at 15. Rather, I was told that there was no change in the government's view as to whether there was an issue concerning my continued participation in this case based on the Flemmi 209. *Id.* at 18–19.

In any event, when proceedings resumed in August 1997, the question whether the transcript of the June 27, 1997 colloquy should be unsealed had been eclipsed by more urgent matters. Despite earnest efforts, the government had not yet located or reviewed all of the documents and information required to be produced by the June 26, 1997 Order. There were disputes between the parties concerning what the government was required to produce. In addition, there was some information and certain documents that the government asked me to review *in camera* to determine whether production was necessary. There were also questions whether the Department of Justice task force had developed documents and information to which the defendants were entitled. Thus, at the request of all parties, the commencement of the evidentiary hearings concerning the motions to suppress was postponed.

In August 1997, the government also requested that the evidentiary hearings on the motions to suppress not be conducted until the defendants filed a notice, pursuant to Fed.R.Crim.P. 12.3(a)(1), of any intent that they had to assert a public authority defense, and motions to dismiss the Fourth Superceding Indictment based on claims of immunity and other grounds. I granted the government's motion. *See* August 11, 1997 Order at ¶ 2.

On September 3, 1997, the defendants filed under seal their motion to dismiss, a 63–page memorandum, and a supporting affidavit of Anthony Cardinale, Esq., who was then counsel for Salemme and DeLuca. The grounds for the motion to dismiss included the contentions that: the government had engaged in systematic, outrageous misconduct in connection with the investigation of this case and thus violated defendants' rights to due process; dismissal was required as an exercise of the court's supervisory powers; there had been gross abuse by the government in failing to inform the grand jury of Flemmi and Bulger's status and activities as informants; that immunized testimony had been improperly presented to the grand jury; and illegally obtained electronic surveillance evidence had been presented to the grand jury. *See* Memorandum of Law in Support of Defendants' Motion to Dismiss All Pending Indictments.

Mr. Cardinale's affidavit charged that Special Agent Connolly had attempted to foment violence by telling him in 1989 that Frank Salemme was planning to kill his then client Vincent Ferrara. In addition, Flemmi filed a notice that as part of his defense he would assert that he was authorized by the FBI to engage in the acts now charged as crimes. The defendants submissions were, despite the government's objection, unsealed on September 10, 1997. *United States v. Salemme*, 985 F.Supp. 193, 193–95 (D.Mass. 1997).

On October 6, 1997, the defendants filed, under seal, an 85–page Factual Submission in Support of Defendants' Motion to Dismiss. This Factual Submission referenced and analyzed information defendants had received in discovery.

On October 22, 1997, the government filed, under seal, a 99–page Opposition to Defendants' Motion to Dismiss All Pending Indictments, and attachments. The mem-

orandum thoroughly addressed the law relating to virtually all of defendants' claims except Flemmi's contention that he had been provided immunity for acts with which he is now charged. The theme of the government's submission was, in essence, that the defendants were not entitled to a pretrial evidentiary hearing on their motion to dismiss and that their claims would at trial be proven to be unmeritorious.

At a hearing on October 29, 1997, the merits of the motion to dismiss were argued preliminarily. Most of the discussion focused on defendants' claim that the case should be dismissed because of outrageous government misconduct. I expressed the view that outrageous government misconduct might not be a legally viable basis for pursuing dismissal. October 29, 1997 Tr. at 45, 58. I also said, however, that defendants' supervisory powers claim might be legally viable if certain facts were proven. *Id.* at 45–46.

In addition, I pointed out that First Circuit jurisprudence and other cases indicated that a claim of immunity was to be decided by the court, rather than a jury. *Id.* at 47–48 (citing *United States v. McLaughlin,* 957 F.2d 12, 16 (1st Cir. 1992)). I said, however, that it was not clear to me whether Mr. Flemmi was claiming he was promised immunity or merely asserting authorization, an issue to be decided by a jury. *Id.* at 47. If there was an immunity claim, I noted that it would also relate to the motion to dismiss for grand jury abuse. *Id.* at 48. Finally, I indicated an inclination to start the evidentiary hearings with the motion to suppress the 1984–85 electronic surveillance, which also relates to the motion to dismiss for grand jury abuse. *Id.*

Also on October 29, 1997, following a trial, I found Mr. Cardinale not guilty of criminal contempt charges I had instituted against him after documents produced to defendants in discovery pursuant to the June 26, 1997 Protective Order limiting their dissemination were discovered in the Norfolk County Jail cell of reputed Patriarca Family member Frederick Simone. *Id.* at 14. These proceedings occupied much of October 1997.

It was then necessary to litigate whether DeLuca, Flemmi, and Salemme were entitled to appointment of counsel under the Criminal Justice Act, 18 U.S.C. § 3006A, because they claimed that they were each financially unable to retain counsel privately any longer. *See United States v. Salemme,* 985 F.Supp. 197, 199–200 (D.Mass. 1997). The government raised questions concerning the propriety of this request. After several hearings, on November 14, 1997, I allowed the defendants' requests and appointed their private counsel to continue to represent them under the Criminal Justice Act. *See* November 14, 1997 Order.

Also on November 14, 1997, I disclosed to defendants, under seal, certain documents and information I had reviewed in camera, and certain information from the Executive Summary of the Department of Justice investigation. I then expected the evidentiary hearings would commence in early December 1997. The defendants, however, requested a continuance.

On December 4, 1997, I held a hearing to address matters concerning the forthcoming evidentiary hearings. These matters included questions I wished to raise concerning my possible recusal which were presented by the witness list for the first phase of the hearings. I had worked with a number of the 32 witnesses identified by the defendants. Once again, I had and expressed two concerns. First and foremost, I did not wish to continue to preside if it was impermissible or inappropriate for me to do so. *See* December 4, 1997 Tr. at

58. Second, recognizing that any party might become unhappy with my future decisions, I wanted to minimize the risk that a disappointed litigant would have a reasonable basis for seeking to disrupt or reopen proceedings based on my participation in them. *Id.* at 58–59.

Thus, with regard to the possible issues concerning recusal that I discerned, I told the parties my tentative view of the applicable law, *id.* at 24–34; described what I perceived to be the relevant facts; offered the parties repeated opportunities to ask me questions; required them to reflect on what I had said; and with regard to defendants, required them to consult their counsel before expressing any view on the propriety of my continued participation. *Id.* at 34–77. I emphasized any views I expressed were "tentative," and I wanted the question of my possible recusal to be "resolved in a thoughtful, considered way." *Id.* at 17. I also recognized, however, that legal proceedings are dynamic, something unforeseen could emerge, and therefore while I wanted to achieve as much finality as possible on the recusal question, perhaps true finality was not possible. *Id.* at 22.

Among other things, I said that, "I recall[ed] no involvement in any matters pertaining to this case, including the 1984–85 electronic surveillance." *Id.* at 20. I also said that: "I don't recall working on any case related matters with Mr. Crossen. And I had no involvement with Mr. Crossen regarding any matter pertaining to this case." *Id.* at 40. I noted that the FBI reports of the July 1997 interviews of Messrs. Weld and Crossen indicated that their recollections were consistent with mine with regard to the 1984–85 electronic surveillance. *Id.* at 20.

In response to an invitation by me, Mr. Wyshak raised the concern that possibly an argument could be made that as Deputy United States Attorney I suspected Bulger and/or Flemmi were informants and had a duty to disclose my suspicions concerning them to the officials actively participating in the 1984–85 electronic surveillance. *Id.* at 21. I stated that while I may have heard of Bulger and Flemmi when I was a prosecutor, they were not individuals I had encountered in the work I was doing, and had no reason to wonder whether they were informants. *Id.* at 22. Mr. Wyshak reiterated that he was not suggesting that I be disqualified, but only was concerned about a possible post-conviction attack by defendants on this basis. *Id.* at 23.

I went on to describe in detail my professional and personal relationship with Mr. Weld, including the dinner I had in his home in March 1997. *Id.* at 34–37. I also discussed my associations with former Assistant Attorney General Trott, *id.* at 38–39, and his colleague Frederick Hess, who reviewed the application for the 1984–85 electronic surveillance on behalf of Mr. Trott, *id.* at 39–40. After discussing other witnesses, I reiterated and amplified my prior disclosures concerning Mr. Ring. *Id.* at 45–46.

I then reviewed my association with Mr. O'Sullivan. *Id.* at 46–47. In essence, I described that as the Chief of the Strike Force, Mr. O'Sullivan reported directly to Mr. Weld, rather than through me and that he and I had early in my tenure discussed public corruption matters. *Id.* The summary of Mr. O'Sullivan's calendar entries produced by the government on February 5, 1997, has an entry indicating that he spoke to Mr. Weld and me about the "Angiulo T–3, etc." on November 12, 1981. I understand this to be a reference to the FBI's electronic surveillance of Angiulo and others. While I have no specific memory of this discussion, Mr. Weld and I had then just begun work at the United

States Attorney's Office and were receiving joint briefings from many sources, so I assume for present purposes that it occurred.

After discussing my association with other individuals on the witness list, including former FBI Special Agents in Charge in Boston Lawrence Sarhartt and James Greenleaf, I addressed former FBI Special Agents Morris, Connolly, and Condon. With regard to Mr. Morris, I said that I may have met him, but did not remember having done so. *Id.* at 44–45. I also said that we did not work together because the Organized Crime Unit he headed worked with the Strike Force, which was separate from the United States Attorney's Office. *Id.* at 45.[10]

With regard to Mr. Connolly, I said I may have met him, but had no recollection of having done so. *Id.* at 49. I also said we did not work on anything together. *Id.*

Finally, for present purposes, I discussed Mr. Condon. I said that I thought I met Mr. Condon in some context when I was Deputy United States Attorney, but I had no memory of where we encountered each other. *Id.* at 52. I also described Mr. Condon's June 9, 1997 brief interview with me as part of a background investigation he was employed to conduct for the Department of State concerning Mr. Weld's then proposed appointment to be Ambassador to Mexico. *Id.* at 52–53. As I noted, as of June 9, 1997, I had not seen any document that suggested that Mr. Condon had any connection with this case. *Id.* at 52. It was not discussed at all. *Id.* at 52–53.[11]

Following my disclosures I encouraged the parties to think about the issues concerning my recusal at least overnight, and longer if they wished, and to do any research they felt was appropriate. *Id.* at 54–55, 58–60. After a break, however, the defendants insisted that they were ready to respond. They and their counsel stated that they did not believe that my recusal was required by any provision of § 455(a) or (b). *Id.* at 64–67. More specifically, they said they did not believe that I was biased or prejudiced concerning any party, or that I had knowledge of any disputed evidentiary fact. *Id.* at 65. In addition, they stated that with regard to § 455(a), they did not believe that a reasonable person would question my impartiality. *Id.* Nevertheless, the defendants waived any right to object to my participation on this basis in any post-conviction proceeding or otherwise. *Id.* at 68–76.

---

**10.** The information and materials obtained by the government from Mr. O'Sullivan and furnished to me and the defendants on February 5, 1997, include a March 24, 1982 letter from me to Mr. Morris transmitting, at Mr. O'Sullivan's suggestion, a letter with unopened enclosures from the Office of the Attorney General of Massachusetts to Mr. Weld concerning what the Attorney General's office called the "Patriarca Tapes," which were subject to "an old federal court order of impoundment."

In the process of locating my copy of the March 24, 1982 letter, I also found two memoranda, each dated March 10, 1982, indicating that Mr. Morris and I had met on professional matters. I am furnishing them under seal to the government in redacted and unredacted form. If there is no objection to the disclosure of the redacted version, they will be provided to defendants. After hearing from the parties, I will decide whether the memoranda should be made part of the public record.

**11.** At the conclusion of his questioning of me about Mr. Weld, Mr. Condon did inquire whether there was anything I wanted to ask him. I had on June 6, 1997 unsealed my May 22, 1997 Memorandum and Order and the government's response, which together identified Bulger and Flemmi as informants. These disclosures were highly publicized. I inferred Mr. Condon was asking whether I had any questions for him regarding this case, but felt he was only being humorous. I said "no" and the brief interview of me concluded.

The prosecutors requested and received an opportunity to consult their colleagues. Later on December 4, 1997, they submitted the following statement:

The Court has instructed the United States to state the government's position regarding the applicability of Title 28, United States Code, §§ 455(a), 455(b)(1) and 455(b)(3) in the case at bar. The government's position, based upon information provided by the Court to the parties on this date and on prior occasions, is that mandatory disqualification is not applicable in this case.

Particularly, the fact that the Court was Deputy United States Attorney and Chief of the Public Corruption Unit during the period that certain electronic surveillance in this case was planned and implemented does not, in and of itself, require disqualification as a matter of law pursuant to §§ 455(b)(1) or 455(b)(3). Based upon the information currently known to the government, § 455(b)(3) is not implicated.

Further, the government does not believe that the Court has a personal bias or prejudice concerning any party in this case. Nor is the government aware that the Court has personal knowledge of disputed evidentiary facts concerning the proceeding. *See* § 455(b)(1).

The government does believe, however, that based upon the nature of the past relationships between the Court and several prospective witnesses in this case, the Court's impartiality might reasonably be questioned. *See* § 455(a). However, pursuant to § 455(e), the government waives any motion to disqualify the Court based upon the grounds set forth in § 455(a).

Accordingly, on December 5, 1997, I issued an Order stating that I found that "it was permissible for me to continue to preside in this case," and "in view of my intense involvement in this complex matter for more than two years, and the value to the parties and the administration of justice of having this case proceed on an informed and efficient basis, I would do so." December 5, 1997 Order at 3–4. I also wrote, however, that:

As stated in court, the parties, particularly the defendants, are encouraged to continue to consider the issues relating to my possible disqualification and to inform the court when hearings resume on December 11, 1997, if they have any further questions or, upon reflection, wish to object to my continued participation in this case for any reason.

*Id.* at 3 n. 6.

On December 11, 1997, in response to my inquiry, the government and the defendants stated that they neither had any further questions to ask me nor any objection to my continued participation in the case. December 11, 1997 Tr. at 4–5. They also said that they did not wish to withdraw their waivers of any claim that I should be disqualified under § 455(a). *Id.* at 5.

On December 11, 1997, Flemmi clarified and confirmed that he was as part of his motion to dismiss contending that he had been promised immunity by the FBI. *Id.* at 6–7. I pointed out that the government had correctly contended that defenses of authorization, lack of criminal intent, and entrapment by estoppel presented issues for a jury to decide. *Id.* at 9. I reiterated my understanding, based on a series of cases I cited, that an issue of immunity, however, was to be decided by the court and could be addressed pretrial in the context of a motion to suppress or dismiss. *Id.* at 9–10.

As I anticipated that the testimony of former Special Agents Morris and Connolly would be important to the issue of im-

munity, and that they might assert a Fifth Amendment right not to testify, I had invited their counsel to attend the December 11, 1997 hearing. Robert Popeo, Esq., counsel for Mr. Connolly, indicated that his client did not have access to the information and documents that the parties had and, therefore, there were foreseeable issues concerning whether Mr. Connolly would testify unless compelled to do so. *Id.* at 34–55. William Kettlewell, Esq., concurred with regard to Mr. Morris, his client. *Id.* at 48.

The government indicated that it did not then know whether it would seek an immunity and compulsion order, pursuant to 18 U.S.C. § 6002 *et seq.,* for Mr. Connolly and/or Mr. Morris. *Id.* at 55. That would depend on the scope of the hearings because the government continued to contend that their testimony was not relevant. *Id.* at 55–56.

The defendants, however, asserted that the testimony of Mr. Connolly and Mr. Morris was central to the issues to be litigated. *Id.* at 56–57. Thus, they expected to request that I compel the government to immunize them, pursuant to *United States v. Angiulo,* 897 F.2d 1169 (1st Cir.), *cert. denied,* 498 U.S. 845, 111 S.Ct. 130, 112 L.Ed.2d 98 (1990), and *United States v. Castro,* 129 F.3d 226 (1st Cir. 1997).

Accordingly, I encouraged the parties to speak with counsel for Messrs. Connolly and Morris about the foreseeable issues. *Id.* at 59–60. Other issues relating to the forthcoming hearings were then discussed, including the scope of the government's duty to disclose statements of witnesses.

I provided the parties an opportunity to supplement their submissions on the immunity and discovery issues, among others. In response, the government filed a lengthy memorandum on December 15, 1997.

Further hearings were conducted on December 18 and 23, 1997. On December 18, 1997, the government argued strongly that there was not a proper basis for an evidentiary hearing on Flemmi's claim of immunity, December 18, 1997 Tr. at 31–32, 41; that Flemmi should be required to be the first witness at any evidentiary hearing, *id.* at 39–40, 55; and the next witnesses should be Mr. Crossen and DEA Special Agent David Boeri, the applicant and affiant respectively concerning the 1984–85 electronic surveillance, *id.* at 22–23. The defendants disagreed. Flemmi, however, did undertake to file a supplementary affidavit concerning his claim of immunity. *Id.* at 51–52. He did so, under seal, on December 22, 1997.

At a hearing, on December 23, 1997, I informed the parties that I had decided that Flemmi was entitled to an evidentiary hearing on his claim of immunity. December 23, 1997 Tr. at 8. I also described the manner in which I intended to resolve other disputed issues, and discussed some others.

On December 29, 1997, I issued an Order memorializing and to some extent amplifying the decisions I described on December 23, 1997. *See United States v. Salemme,* 1997 WL 810057 (D.Mass. December 29, 1997). Many of my decisions were contrary to the government's position.

More specifically, I allowed Flemmi's request for an evidentiary hearing on his motion to dismiss to the extent that the motion asserted that he was promised immunity from prosecution in return for his cooperation with the FBI. *Id.* at *1–3. I did not require Flemmi to testify first, or otherwise instruct on the order of the defendant's witnesses. *See id.* at *4. I found that the government was required to disclose to defendants, pursuant to Fed.

R.Crim.P. 12(i), the statements of all present and former law enforcement agents called by defendants. *Id.* at *4–6. In addition, despite the objections of the government, I decided to make part of the public record the affidavits Flemmi had filed, under seal, on September 10, 1997 and December 22, 1997, as well as the government's October 22, 1997 opposition to the motion to dismiss. *Id.* at *7. Consistent with the government's objection, however, I decided to maintain under seal at least temporarily defendants' October 6, 1997 Factual Submission because it related in part to aspects of the motion to dismiss as to which an evidentiary hearing had not been granted. *Id.* at *8.

On January 5, 1998, I unsealed Flemmi's two remaining affidavits and the government's opposition to the motion to dismiss. January 5, 1998 Order. In the September 10, 1997 affidavit Flemmi asserted, among other things, that: in 1969 his "handler," FBI Special Agent Paul Rico, told him to flee because he was about to be indicted for the attempted murder of John Fitzgerald, an attorney representing an FBI informant, Joseph Barboza; in 1979, an FBI agent said that the FBI had gone to Mr. O'Sullivan to assure that Bulger and Flemmi would not be indicted in the race-fixing scheme; Flemmi and Bulger were told that John Martorano would be indicted and they warned him so he could flee; Flemmi was advised of various pending investigations so he could avoid being caught in them; Flemmi and Bulger got together frequently with FBI agents at the agents' homes; and on one occasion Mr.

Morris requested and received $5000 from Flemmi and Bulger.

In the December 21, 1997 affidavit intended to provide evidence of the alleged promise of immunity, Flemmi stated, among other things, that: Mr. Rico told Flemmi that as long as he was an FBI informant he should not be concerned about being arrested or prosecuted; Mr. Rico told Flemmi in 1974 to return to Boston and the Fitzgerald attempted murder charge against him would be dismissed; Flemmi returned and this occurred; Mr. Condon later told Flemmi that the federal fugitive charges against him had been dismissed; the FBI had gone to Mr. O'Sullivan to ensure Flemmi and Bulger would not be prosecuted in the race-fix case; the FBI also arranged to keep Flemmi out of a prosecution of John Baharian and Steve Puleo; and, when in the mid–1980's Bulger and Flemmi told the FBI that they intended to stop engaging in the activities that provided them information valuable to the FBI, the FBI strongly urged them to continue.

The evidentiary hearings began on January 6, 1998. I do not wish to summarize or comment substantively on the evidence received between January 6 and 21, 1998, when the hearings were suspended. However, initially the government complained about the fairness of the hearings and expressed its frustration when I overruled its objections to some of the evidence that the defendants were offering.[12] Indeed, at one point, after Assistant United States Attorney Brian Kelly, who was responsible for the witness, made an objection to the admission of a document based on rele-

---

12. The following are some examples of the government's complaints. Mr. Wyshak: "I think what we're trying to do is get a fair hearing here." January 8, 1998 Tr. at 264. Mr. Herbert: "[T]he reason this [hearing] is so substantively unfair to the government apart from the fact that procedurally it

shouldn't be happening ..." *Id.* at 277. Mr. Wyshak, after an objection was overruled, "Well, of course, its overruled. Every objection is overruled." January 13, 1998 Tr. at 91. Mr. Wyshak: "This is an unfair proceeding, your Honor, to make those kinds of rulings." *Id.* at 142.

vance which I overruled, Mr. Wyshak interrupted and complained so loudly and persistently that for the first time in more than 12 years as a judge I felt compelled to raise the prospect of holding an attorney in contempt for the nature of his conduct in court. January 8, 1998 Tr. at 167–69.

In addition, on January 8, 1998, the government objected to any further questioning of witnesses by counsel for any defendant other than Flemmi. *Id.* at 126, 242, 252–54. The government explained that its previous representation that it was, in its view, permissible for other counsel to question witnesses was based on the mistaken assumption that only one attorney would question each witness. *Id.* at 242, 247, 253. On January 9, 1998, I found tentatively that Martin Weinberg, Esq., counsel for John Martorano, had standing to question witnesses because Mr. Martorano was intercepted during the 1984–85 electronic surveillance. January 9, 1997 Tr. at 96–97. After a hearing on the issue on January 15, 1998, I held that counsel for Salemme, DeLuca, and Martorano had standing to question witnesses on relevant subjects at the pending hearings based on their motion to dismiss as an exercise of the court's supervisory powers and in order to permit me to consider the evidence being received in deciding the foreseeable possible trial issue of whether Flemmi's statements would be admissible against them as coconspirator hearsay. January 15, 1997 Tr. at 67–77; January 20, 1998 Order at ¶ 1.

On January 9, 1998, Ralph Ranalli, a reporter for the *Boston Herald,* called my Deputy Clerk. Mr. Ranalli said that two members of the *Boston Herald* editorial department had received calls informing them of "the existence of an FBI '209' in which defendant Stephen Flemmi names [me] as a 'source of information for the mob.'" January 12, 1988 letter from Mr. Ranalli to the Court. Mr. Ranalli asked to speak to me about this. On Sunday, January, 11, 1998, I responded by telephone to an Assistant United States Attorney who was trying to reach me to give me a "heads-up" on the fact that the Special Agent in Charge of the FBI, Barry Mawn, had received a similar inquiry from Mr. Ranalli, to which he made no comment.

On Monday, January 12, 1998, I instructed my clerk to have Mr. Ranalli put his request in writing. He did so. I also began assembling the transcripts relating to the June 27, 1997 colloquy concerning the 209 of Flemmi's statements on August 8, 1983, and later, related materials.

I discussed Mr. Ranalli's inquiry with the parties, in a closed session, on January 14, 1998. I reiterated the desire that I had expressed on June 27, 1997 to make the 209 and the colloquy concerning it a matter of public record. January 14, 1998 Tr. (under seal) at 21. The defendants again opposed unsealing. *Id.* at 21–22. I asked the parties to think about the matter, which I said we would revisit. *Id.* at 22–23.

On January 15, 1998 the government said it was developing heightened concern about whether it might at some point be argued that I have personal knowledge of a disputed evidentiary fact. January 15, 1998 Tr. (under seal) at 13–14, 16–18. The government stated that Mr. O'Sullivan had been interviewed, and his calendar reflected that he spoke to me on August 11, 1983 about "Angiulo." *Id.* at 15. Mr. Herbert said that the government was not at that time requesting my recusal, but did wish to talk to Mr. O'Sullivan about that entry. *Id.* at 20–21. The government also expressed concern about a possible post-conviction attack by the defendants based on the 209. *Id.* at 6–7, 21.

On the evening of Friday, January 16, 1998, Mr. Ranalli told my Deputy Clerk that others at the *Boston Herald* had received additional calls in which it was claimed that I had known about the Flemmi 209 for a year.

I discussed this matter again with the parties when we reconvened on January 20, 1998. Defense counsel said that their clients continued to believe that the 209 did not provide a basis for my recusal and opposed its unsealing. January 20, 1998 Tr. (under seal) at 8–9. The government had not yet spoken to Mr. O'Sullivan. *Id.* at 24–25. In response to my inquiry, the government said that it was not then asking for my recusal on any of the prongs of § 455. *Id.* at 6. The government agreed with me that the June 27, 1997 colloquy and certain related matters should be made part of the public record. *Id.* at 14–15, 30. I issued an Order doing that on the afternoon of January 20, 1998.

The government's reference to the entry in Mr. O'Sullivan's calendar concerning a meeting with me on August 11, 1983 caused me to wonder whether I had any document regarding such a meeting. As described earlier, when I left the United States Attorney's Office I took my personal, monthly chronological files of letters and memoranda that I wrote. I knew that those files were in an area of my basement that was not easily accessible because of boxes and furniture also stored there. I had perceived no need to consult those files previously. On the evening of January 20, 1998, however, I found the files.

I first reviewed the files for August and September, 1983, and found nothing relevant. Then, out of what I regarded as an abundance of caution, I reviewed the file for December 1984. I was surprised, indeed shocked, to find the December 21, 1984 memorandum from me to Mr. Weld, captioned "AUSA Gary Crossen," memori-alizing a conversation that I had that day with Assistant Attorney General Trott. Although I have no independent memory of the conversation, the memorandum states that on the Friday before Christmas Mr. Trott called for Mr. Weld and, in his absence, spoke to me.

The memorandum states:

In your absence, I took a telephone call on December 21, 1984, from Steve Trott, Assistant Attorney General in charge of the Criminal Division. He asked me about Gary Crossen's background. He then told me that he was reading an affidavit Gary had prepared in connection with a Title III in the Winter Hill case which he and Fred Hess, his expert in this area, consider the worst they have ever seen. He said that initially the affidavit was 138 pages long and much of the information in it was superfluous. When Hess discussed it with Crossen, Crossen was combative. The affidavit was reduced and revised, but Trott said that it remained "awful," with ten words often being used when one would do. He also said that the affidavit had been prepared for the signature of Assistant Attorney General Lowell Jensen. Trott said the approach to drafting the affidavit seemed to be to include everything possible in the hope that the court would feel there must be something of substance in there somewhere, but that he felt the effect would be just the opposite. He said that in view of the apparent urgency of this matter, he would approve the Title III, but he did want to to [sic] know of this problem.

I told Steve that the Task Force had been stretched out working on Title III's and other matters, but that I was sure you would agree that there was no excuse for substandard legal work. I thanked him for calling and assured him

that we would address the matter seriously.

A copy of the memorandum was sent to AUSA Janis M. Berry, the OCDETF Coordinator.

I was disturbed to find the memorandum because I had previously stated that I recalled no involvement in matters pertaining to this case, including the 1984–85 electronic surveillance. *See* December 4, 1997 Tr. at 20. Mr. Trott, however, had plainly talked to me about the quality of Mr. Crossen's work on the application. I decided to bring the memorandum to the parties' attention immediately. I regretted that it would add another complication to an already complicated case.

Rather than continuing the testimony I was hearing on January 21, 1998, I met with counsel and the defendants in a session closed to the public. I gave them the memorandum. I expressed three views: first, my visceral reaction that I should disqualify myself under § 455(b) because I had personal knowledge of a disputed evidentiary fact or because I might be a witness, January 21, 1998 Tr. (under seal) at 12–13; second, that I should not make that decision based on my visceral reaction, but only after hearing from the parties and taking time to reflect, *id.* at 13–14; and third, that the memorandum and issues it raised should be promptly placed on the public record, *Id.* at 14.

The parties stated, however, that the matter should not be immediately placed on the public record. *Id.* at 24–25, 27. Indeed, the government expressed the view that the confidentiality of the memorandum might be protected by the deliberative process privilege. *Id.* at 32. Thus, I agreed to maintain its confidentiality at least temporarily. *Id.* at 30. I did, however, state in public session that the public hearings would be suspended for at least two weeks because I had "very recently

discovered information relating to my tenure as Deputy United States Attorney that may bear on the question of whether I have knowledge of a disputed evidentiary fact regarding one aspect of the current hearings." January 21, 1998 Tr. (public session) at 7. I noted that the information might be privileged and at the request of the parties I would seal it at least temporarily. *Id.* at 7–8. I said, however, that if issues concerning my possible recusal were to be litigated, I intended to do that on the public record. *Id.* at 8.

I then resumed the lobby conference with counsel and the defendants. Among other things, I urged them to question me about the memorandum, associated issues, or anything else that might bear on the matter of recusal. January 21, 1998 Tr. (under seal) at 50, 52. There was discussion of the possible implications of the memorandum. *Id.* at 51, 58–59. In addition, the government asked me questions arising from recent media reports regarding the 1984 and 1985 prosecution of Vincent Piro. *Id.* at 53, 56.

More specifically, the prosecutors referenced, and later that day gave me, a December 19, 1997 *Boston Globe* article, which said in its most pertinent parts:

An FBI agent reportedly told gangster James "Whitey" Bulger about an undercover operation that targeted former state representative Vincent S. Piro in 1983, according to a report on WCVB (Channel 5) last night.

WCVB reported that days after Bulger learned of the sting, Piro returned $5,000 he had taken from another agent posing as developer. The TV report said information about the leak to Bulger is contained in an internal FBI document.

\*     \*     \*     \*     \*     \*

WCVB reported that Bulger learned of the sting from John Connolly.

Matthew Taylor, *Report Says FBI Tip Foiled Piro Sting*, Boston Globe, December 19, 1997. Mr. Connolly and his lawyer, Mr. Popeo, who had also represented Mr. Piro, were reported to have denied the allegations. *Id.*

I explained that I recalled that Mr. Piro was a state senator from Somerville; had taken $10,000 from an FBI undercover operative; and later returned the same amount of money, but not the same bills. The case was prosecuted by Assistant United States Attorneys John Pappalardo, Michael Tracy, and Thomas Curley, who were members of the Public Corruption Unit when I was its Chief. January 21, 1997 Tr. (under seal) at 54–55. We suspected that Mr. Piro was somehow tipped off, but I had no knowledge of who, if anyone, did that. *Id.* at 55. In response to a question from the government, I stated that I did not recall any suspicion that Mr. Piro was tipped off because of a relationship between the FBI and Bulger. *Id.* at 56. I suggested, however, that the government might wish to ask Mr. Pappalardo that question. *Id.* at 57.

In addition, that evening I again accessed my chronological files to see if I could find anything relevant to the Piro issue the government had brought to my attention. In the file for October 1984, which consisted substantially of matters relating to my nomination to the District Court that month, I found a memorandum concerning the Piro case. The first Piro trial had ended with a hung jury. Mr. Pappalardo and his colleagues were preparing to prosecute Piro again, and also for the anticipated trial of Lawrence Bretta, the former Mayor of Somerville who had served as the head of the General Services Administration in this region. On October 15, 1984, I wrote the prosecutors a memorandum which stated in pertinent part:

> I would like to get together in the near future to do a "post-mortem" on the Piro case with a view to perfecting the next Piro prosecution and seeing what lessons can be profitably learned with regard to Bretta. The following are some points which occurred to me over the weekend which I would like to include in the discussion.
>
> *    *    *    *    *    *
>
> 5. *Evidence regarding return of the money.* We should carefully prepare every form of evidence tending to demonstrate that something caused Piro to change his mind, either because he was tipped off or had another motive. The Dennis Conden [sic] and John Morris matter should be fully developed and prepared for possible use at trial; if Morris has relevant testimony nothing should be allowed to stand in the way of presenting it. We should also recall that [*Boston Globe* journalists] David Farrell and Bill Doherty made inquiries about a possible undercover investigation concerning Piro around the time of the return of the money. The mere fact of these inquiries is evidence that there were at least rumors of an undercover operation at the time. Although the Department of Justice requires that the Attorney General personally authorize subpoenas to newsmen, we would in this case not necessarily be interested in the source which prompted inquiries, but rather might be satisfied to show that the rumors generally existed. Thus we might be able to get any necessary authorization. In addition, it is possible that Farrell and Doherty would willingly testify.
>
> We should also recall that the *Globe*'s Spotlight team was during the relevant time period doing a series on the legisla-

ture which included investigation of Piro. Testimony concerning this could also indicate that Piro got nervous and changed his mind about keeping the money, rather than lacking any "criminal intent" when took the money.

A copy of this memorandum was also sent to Mr. Weld and the attorneys in the Public Corruption Unit.

I provided this memorandum to the parties on January 23, 1998.[13] I told them that I had no independent recollection of Mr. Condon or Mr. Morris being discussed, but some discussion obviously occurred and the memorandum indicates that there was a concern about whether a leak came from them. January 23, 1998 Tr. (under seal) at 29–30. I noted that I recalled speculation at the time that the FBI undercover operative may have been identified as a government agent when he attended a Bruins hockey game with known FBI agents, as well as speculation about a possible FBI leak. *Id.* at 30–31.

The government informed me and the defendants that the FBI had already interviewed Mr. Pappalardo, who said that he never associated the possible disclosure of information to Mr. Piro with Bulger. *Id.* at 31–32. The government stated, however, that Mr. Pappalardo recalled that Mr. Morris had said that after Mr. Piro returned the money, Mr. Morris told Mr. Condon about the undercover agent, and Mr. Condon told Mr. Popeo, for whom he was providing investigatory services. *Id.* at 32. I was told Mr. Pappalardo believed he discussed this with me. I said I would be surprised if Mr. Pappalardo learned this information before Mr. Piro was acquitted at his retrial, because I did not recall having heard this before. *Id.* at 32–33. In any event, I reiterated that I had

no memory of any discussion concerning Bulger. *Id.* at 33. I was then told by the government that it was Mr. Connolly who had gone to the Bruins game with the undercover agent. *Id.*

I met again with the parties on January 28, 1998 to discuss further the implications of the memoranda I had found and other issues concerning my possible recusal. The government informed me that Mr. O'Sullivan's calendar indicates that I asked him to attend a meeting with the FBI to discuss how Piro knew. January 28, 1998 Tr. (under seal) at 12. I do not recall any such meeting, but it certainly may have occurred.

With regard to the Flemmi 209, I had previously been told by the government, on January 21, 1998, that Mr. O'Sullivan said he had never seen the document and it does not appear that Mr. Ring, who as Mr. Connolly's supervisor would have reviewed the 209, told Mr. O'Sullivan about it. January 21, 1998 Tr. (under seal) at 39–40. I was also told that Mr. O'Sullivan and Mr. Ring never had any concern that I was a source of any leaks regarding the Angiulo case. *Id.* at 38. In any event, I was not told that either Mr. O'Sullivan or Mr. Ring believed they discussed the Flemmi 209 or the information it contained with me. *Id.* at 38–40.

I met again with the parties on February 4, 1998. The government informed me and the defendants that it would, if necessary, grant Mr. Morris immunity, either informally or pursuant to 18 U.S.C. § 6002 *et seq.*, and he therefore would be a witness in the pending hearings. February 4, 1998 Tr. (under seal) at 19. The government added that it had not yet decided

---

13. Although this memorandum would probably be protected by the deliberative process privilege, the government promptly agreed that it should be furnished to the defendants and the parties now agree that it should be part of the public record.

whether to grant Mr. Connolly immunity. *Id.* at 22.

On February 4, 1998, I also attempted to determine whether any clear consensus had emerged on the issue of my recusal. As I encouraged the parties to be candid in working with me to explore the issues preliminarily, I will not describe the details of the views expressed. As indicated earlier, however, the defendants stated that they did not consider my disqualification to be necessary or appropriate, and would waive any possible ground for disqualification under § 455(a). *Id.* at 37–39. The government did not express a definitive view on the issue of my disqualification. *Id.* at 34. Rather, it addressed again certain concerns it felt should be considered and encouraged me to reflect on them further before requiring the government to take a position on my recusal. *Id.* at 28–30, 35. I agreed to do so. *Id.* at 35.

This Memorandum and Order represents my response to the government's request.

### III. *The Legal Standards*

The following is some discussion of the relevant legal standards and my present, still preliminary, view of how they apply in the circumstances of this case.

#### A. *Disqualification for Actual Bias or Prejudice Concerning A Party.*

■ A judge must disqualify himself if he actually "has a personal bias or prejudice concerning a party .." 28 U.S.C. § 455(b)(1). The present parties to this case are the United States, Stephen Flemmi, Francis Salemme, Robert DeLuca, and John Martorano. I do not believe I have a personal bias or prejudice concerning any party. The parties have previously agreed on this point. If a party now has a different view, I will not take offense if it is

expressed so that the issue can be addressed.

More specifically, as discussed in § III. D. *infra*, the statements concerning me in the August 8, 1983 209 do not cause me to be biased or prejudiced against Mr. Flemmi.

Similarly, the fact that I raised, but was not required to pursue, the issue of contempt with regard to an outburst by Mr. Wyshak on January 8, 1998 does not manifest any bias or prejudice against him. Mr. Wyshak and his colleagues have, over the past three years, almost always been professional and respectful in their dealings with me. I believe that professionalism and respect have been reciprocated.

The Supreme Court has indicated that an extrajudicial source is, as a practical matter, almost always required to establish a disqualifying bias or prejudice. *Liteky v. United States*, 510 U.S. 540, 553–56, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). There could, however, be a case in which a judge's conduct in court is "so extreme as to display clear inability to render fair judgment." *Id.* at 551, 114 S.Ct. 1147. The government has not in our discussions since January 20, 1998 suggested that this is such a case. I am confident that it is not.

Moreover, as the Court of Appeals for the First Circuit has stated, "[a] court's disagreement—even one strongly stated— with counsel over the propriety of trial tactics does not reflect an attitude of personal bias against the client." *In re Cooper*, 821 F.2d 833, 841 (1st Cir.1987). Consistent with the Court of Appeals for the First Circuit's approach in *Cooper*, issues of a judge's relationship with counsel have typically been analyzed under § 455(a) rather than § 455(b)(1). *See, e.g., United States v. Murphy*, 768 F.2d 1518, 1536–40 (7th Cir.1985); *Henderson v. Department*

*of Public Safety and Corrections*, 901 F.2d 1288, 1295–96 (5th Cir.1990).

Similarly, issues regarding a judge's relationship with, or possible attitude concerning, prospective witnesses are usually analyzed under § 455(a) rather than § 455(b)(1). *See, e.g., In re United States,* 666 F.2d 690, 695–98 (1st Cir.1981); *Parrish v. Board of Commissioners of Ala. State Bar,* 524 F.2d 98, 103–04 (5th Cir. 1975) (en banc); *Hirschkop v. Virginia State Bar Ass'n,* 406 F.Supp. 721, 724–25 (E.D.Va.1975). In any event I also believe that I can, to the extent necessary, impartially evaluate the testimony of all of the witnesses. Once again, however, the parties should not hesitate to raise any question they may have about this so that it can be resolved.

B.  *Disqualification Under § 455(b) Based on the December 21, 1983 Memorandum*

■  Three provisions of § 455(b) have been discussed concerning the December 21, 1983 memorandum regarding my conversation with Mr. Trott. Section 455(b)(3) requires the disqualification of a judge, "[w]here he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding or expressed an opinion concerning the merits of the particular case in controversy." Neither the investigation leading to this case, nor the case or the present hearings on the motions to dismiss or suppress were pending when I was Deputy United States Attorney. Thus, I question whether § 455(b)(3) is applicable here.

■  More relevant for purposes of analysis, however, is the portion of § 455(b)(1) which requires recusal if a judge has "personal knowledge of disputed evidentiary facts concerning the proceeding." This requirement exists because

"such personal knowledge vitiates the carefully constructed rules of procedure and evidence that ensure deliberate, unbiased finding." *United States v. State of Alabama,* 828 F.2d 1532, 1546 (11th Cir. 1987) (holding that judge was disqualified in case in which he was required to make factual findings about partisan events concerning desegregation of state universities in which he was actively involved as a state senator and private lawyer), *cert. denied sub nom. Board of Trustees of Ala. State Univ. v. Auburn Univ.,* 487 U.S. 1210, 108 S.Ct. 2857, 101 L.Ed.2d 894 (1988). A judge's personal knowledge must be of a disputed *evidentiary* fact to require recusal. Thus, one judge declined to disqualify himself when his own prior testimony to a regulatory agency would be introduced in a case before him, but only as "background" evidence. *In re Wyoming Tight Sands Antitrust Cases,* 726 F.Supp. 288, 291–93 (D.Kan. 1989). In any event, as I understand it, this § 455(b)(1) "disqualification provision is directed toward knowledge of disputed evidentiary facts, that is, matters underlying the cause of action … the statutory language [is not] directed toward routine judgments of credibility." *Plechner v. Widener College, Inc.,* 569 F.2d 1250, 1263 (3rd Cir.1977). *See also Parrish,* 524 F.2d at 104 ("Credibility choices are not disputed facts.").

■  I continue to believe that I did not participate in the process of reviewing for submission to the court the application for the 1984–85 electronic surveillance. As described earlier, the recollections of Messrs. Weld and Crossen are reportedly consistent with mine. In addition, on January 21, 1998, the government informed me and the defendants that there is no reference to me in the Department of Justice's official file concerning the 1984–85 electronic surveillance, and that neither the affiant, DEA Special Agent Boeri, nor

the Special Agent in Charge of DEA in Boston, Robert Stutman, recall speaking with me about the matter. January 21, 1998 Tr. (under seal) at 8, 29.

Nevertheless, I did have the telephone conversation with Mr. Trott described in the December 21, 1984 memorandum. It now appears to me, however, that the memorandum indicates that Mr. Trott had decided to authorize the application before calling me. He neither solicited nor received any advice on its merits from me. Rather, as the caption to my memorandum reflects, he wished to discuss Mr. Crossen and complain about the style of the documents he had drafted.

I note again that I wrote, "[Mr.] Trott said the approach to drafting the affidavit seemed to be to include everything possible in the hope that the court would feel that there must be something of substance in there somewhere, but that he felt the effect would be just the opposite." On January 21, 1998, I expressed the thought that this statement might arguably bear on the materiality of the alleged omissions from the affidavit submitted in support of the application. January 21, 1998 Tr. (under seal) at 17–18. This is an issue in dispute in the current proceedings. *See Salemme*, 978 F.Supp. at 349, 351–52. On reflection, however, it appears to me that Mr. Trott was not saying that he had approved an application he viewed as legally insufficient. Rather, he was suggesting that a judge might reject the application because the information it contained was not presented clearly.

In any event, the application as approved by Mr. Trott was filed the next business day, Monday, December 24, 1984, and a court order issued. Although I have no memory or record of it, I may have discussed Mr. Trott's call and complaint with Mr. Weld or others. It is not now clear to me, however, of what disputed

evidentiary fact any such a discussion would give me personal knowledge. No such fact has yet been identified by the parties.

■ The third prong of § 455(b) implicated by the December 21, 1983 memorandum is the provision which requires recusal if the judge, "is to the judge's knowledge likely to be a material witness in the proceeding." § 455(b)(5)(iv). The purpose of this provision is to assure that a judge does not have "to pass on the competence and veracity of his own testimony given with respect to a matter presently in controversy before him." *In re Continental Vending Mach. Corp.*, 543 F.2d 986, 995 (2d Cir.1976). As the language plainly states, it must actually be "*likely* " that the judge will be called upon to evaluate his own testimony for this provision to prompt disqualification. § 455(b)(5)(iv). "Unsubstantiated speculation" about the possibility that the judge will be required to be a material witness concerning a disputed issue is not enough to require recusal. *Murray v. Sevier*, 929 F.Supp. 1461, 1467–68 (N.D.Ala.1996).

In the sessions since January 20, 1998, neither the defendants nor the government has expressed an intention to call me as a witness to testify concerning my conversation with Mr. Trott. Thus, at present, I doubt that my recusal under § 455(b)(5) is necessary or appropriate. Nevertheless, I remain interested in the parties' positions concerning all of the possible § 455(b) questions raised by the December 21, 1983 memorandum, including whether I am a likely, material witness.

C. *Disqualification Under § 455(b) With Regard To The October 15, 1994 Piro Memorandum*

■ Based on the government's representation on February 4, 1998, I under-

stand that the uncertainty it expressed on December 11, 1997 has been resolved, and the government will, if necessary, obtain an order compelling and immunizing Mr. Morris' testimony. Thus, I assume he will be a witness in this case. It remains uncertain, however, whether Mr. Connolly will testify. Mr. Condon is on the witness list and I have not been given any information concerning whether or not he will testify. In the circumstances, I believe that it is prudent and appropriate to assume for present purposes that he will be a witness.

I now realize that I dealt with Mr. Morris while I was Deputy United States Attorney and he was the head of the FBI's Organized Crime Squad. The March 1982 correspondence and memoranda (now under seal) regarding those dealings reflect regular, professional interactions. The October 15, 1984 memorandum, however, indicates that I then had suspicions that Mr. Morris may have jeopardized the Piro case by discussing its investigation with Mr. Condon.

Nevertheless, I continue to believe that I can and will, if necessary, impartially judge the testimony of Messrs. Morris, Condon, and Connolly if I continue to preside and they actually appear as witnesses. Once again, if the parties wish to question this, they should let me know.

In addition, the October 15, 1998 memorandum does not indicate to me that I have personal knowledge of any disputed evidentiary fact. I recall no discussion or suspicion of Bulger in connection with the Piro matter. According to the FBI's report, neither does Mr. Pappalardo.

Moreover, neither the government nor the defendants have indicated that I am likely to be called to testify about the Piro matter in the pending proceedings. Indeed, no one has indicated an intention to attempt to offer any evidence of the Piro matter in this case. If such an attempt were made, I would have to decide whether any testimony on that matter would be allowed before facing any issue of whether I am a likely witness. *See, e.g., United States v. Rivera,* 802 F.2d 593, 601 (2d Cir.1986) (holding that judge was not required to disqualify himself because he would be a material witness where judge found that factual allegations were insufficient to justify an evidentiary hearing); *United States v. Pollard,* 959 F.2d 1011, 1031 (D.C.Cir.) (holding that district judge did not err in denying defendant's motion for disqualification on ground that judge would be a material witness at a hearing collaterally attacking defendant's sentence because judge did not abuse his discretion in denying an evidentiary hearing on that motion), *cert. denied,* 506 U.S. 915, 113 S.Ct. 322, 121 L.Ed.2d 242 (1992).

Accordingly, at present I do not perceive that the October 15, 1984 Piro memorandum requires my recusal under § 455(b), but wish to have the parties' views on this issue as well.

D. *Disqualification Under § 455(b) Regarding The August 8, 1983 Flemmi 209*

█ As a result of the discussions since January 20, 1998, I have considered further the implications of the August 8, 1983 Flemmi 209 for my participation in this case. As described earlier, the government has informed me that neither Mr. O'Sullivan nor Mr. Ring, who would have read the 209 shortly after it was written, had any concerns in 1983 that I was leaking information about the Angiulo matter. Nor is there any indication that any such concern was brought to my attention. Rather, I learned of this matter in the course of this case on June 25, 1997.

I continue to feel comfortable that the information in the August 8, 1983 209 has not caused me to be biased or prejudiced against Flemmi. Nor will it be considered by me in assessing Flemmi's truthfulness or reliability unless it is offered *and* admitted for those purposes. No one to date has stated an intention to offer the 209.[14]

■ Indeed, the defendants have represented that they do not intend to attempt to introduce the August 8, 1983 209 for any purpose. However, even if it were offered and admitted as evidence that, as stated, in 1983 Flemmi trusted Mr. O'Sullivan, it does not appear that its admission would require my recusal under § 455(b). I have no personal knowledge of whether Mr. Flemmi trusted Mr. O'Sullivan. I only know what the 209 says. I acquired that information in the course of this case. However, "knowledge of disputed facts requires disqualification only if the knowledge has an extrajudicial source." *United States v. Widgery*, 778 F.2d 325, 328 (7th Cir.1985). *See also United States v. Coven*, 662 F.2d 162, 168 (2d Cir.1981), *cert. denied*, 456 U.S. 916, 102 S.Ct. 1771, 72 L.Ed.2d 176 (1982).

I do, of course, know that Flemmi's reported belief that I was leaking information concerning the Angiulo investigation is not true. This, however, is not, as I understand it, a disputed evidentiary fact in the pending proceedings.

Thus, at this point, subject to hearing further from the parties, it does not appear to me that my recusal is required under § 455(b) based upon the Flemmi 209.

**E. *Disqualification Based on § 455(a)***

■ As noted earlier, § 455(a) states that a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." This means that there are circumstances in which disqualification may occur even though the judge is not actually biased or prejudiced, and has no extrajudicial knowledge of disputed evidentiary facts. *Chantal*, 902 F.2d at 1018. However, since § 455(a) is implicated when there is no actual impediment to the judge providing a fair trial, disqualification under it can be waived by the parties pursuant to § 455(e). *See Murphy*, 768 F.2d at 1540.

■ As the Supreme Court has explained, the purpose of § 455(a) is "to promote public confidence in the integrity of the judicial process." *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 860, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988). More specifically, "[t]he goal of section 455(a) is to avoid even the appearance of partiality. If it would appear to a reasonable person that a judge has knowledge of facts that would give him an interest in the litigation then an appearance of partiality is created even though no actual partiality exists ...." *Id.* (quoting *Health Services Acquisition Corp. v. Liljeberg*, 796 F.2d 796, 802 (5th Cir.1986)). As these statements indicate, the issue under § 455(a) is to be viewed from the perspective of a reasonable person and the test is an objective one. *In re Allied–Signal*, 891 F.2d at 970.

To reiterate what was written earlier, Justice Anthony Kennedy, who concurred in *Liljeberg*, has more recently stated that:

("Although relevant, evidence may be excluded if its probative value is substantially outweighed by ... considerations of undue delay, waste of time, or needless presentation of cumulative evidence.").

---

**14.** In view of all the other evidence likely to be available to attempt to challenge Mr. Flemmi's credibility and reliability, it is questionable whether the 209 would have sufficient probative value to be admitted for any purpose in any event. *See, e.g.,* Fed.R.Evid. 403

§ 455(a) is triggered by an attitude or state of mind so resistant to fair and dispassionate inquiry as to cause a party, the public, or a reviewing court to have reasonable grounds to question the neutral and objective character of the judge's rulings or findings. I think all would agree that a high threshold is required to satisfy this standard. Thus, under § 455(a), a judge should be disqualified only if it appears that he or she harbors an aversion, hostility or disposition of a kind that a fair-minded person could not set aside when judging the dispute.

*Liteky v. United States*, 510 U.S. at 557–58, 114 S.Ct. 1147 (Kennedy, J., concurring). *See also United States v. Kelly*, 888 F.2d 732 (11th Cir.1989) (stating that "[t]he standard for recusal under section 455(a) is whether an objective, disinterested, lay observer fully informed of the facts underlying the grounds on which recusal was sought would entertain a significant doubt about the judge's impartiality" (citations and internal quotations omitted)).

As indicated earlier, the Court of Appeals for the First Circuit provided meaningful guidance concerning the operation of § 455(a) in *In re Allied–Signal*, where it explained:

> We draw our legal standards for review of a district judge's decision not to disqualify himself [under § 455(a) ] from an analogous case, *In re United States*, 666 F.2d at 690. We there held (1) that "a charge of partiality must be supported by a factual basis," (2) that "disqualification is appropriate only if the facts provide what an objective, knowledgeable member of the public would find to be a *reasonable basis* for doubting the judge's impartiality," and (3) that this court of appeals will allow the district judge "a range of discretion" in making these determinations. *Id.* at 695 (em-

phasis in original). Only if the district court's decision to sit "*cannot be defended as a rational conclusion supported by reasonable reading of the record*" will we insist upon disqualification. *Id.* (emphasis added). *See United States v. Giorgi*, 840 F.2d 1022, 1034 (1st Cir. 1988) ("The decision to grant or to deny a motion for disqualification is committed largely to the discretion of the trial court, and we review it solely to evaluate whether the decision below amounted to an abuse of discretion.")

891 F.2d at 970 (emphasis in original).

The Court of Appeals then went on to emphasize the competing considerations which may need to be weighed in deciding questions of recusal under § 455(a) stating:

> [W]hen considering disqualification, the district court is *not* to use the standard of "Caesar's wife," the standard of mere suspicion. *In re United States*, 666 F.2d at 695 n. *. That is because the disqualification decision must reflect *not only* the need to secure public confidence through proceedings that appear impartial, *but also* the need to prevent parties from too easily obtaining the disqualification of a judge, thereby potentially manipulating the system for strategic reasons, perhaps to obtain a judge more to their liking. *See, e.g., In re Drexel Burnham Lambert, Inc.*, 861 F.2d 1307, 1312 (2d Cir.1988) ("A judge is as much obliged not to recuse himself when it is not called for as he is obliged to when he is."), *cert. denied, sub. nom. Milken v. SEC*, 490 U.S. 1102, 109 S.Ct. 2458, 104 L.Ed.2d 1012 (1989); *In re United States*, 666 F.2d at 694; *United States v. Bray*, 546 F.2d at 851, 857 (10th Cir. 1976); *Alvarado Morales v. Digital Equipment Corp.*, 699 F.Supp. 16, 19 (D.P.R.1988) ("[I]t has been wisely observed that each judge must be alert to

avoid the possibility that those who would question his impartiality are in reality seeking to avoid the consequences of his expected adverse decision . . . ."); H.R.Rep. No. 1453, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin. News 6351, 6355 ("Litigants ought not to have to face a judge where there is a reasonable question of impartiality, but they are not entitled to judges of their own choice."). Even though § 455 was intended to do away with the formal "duty to sit" doctrine, *see Blizard v. Frechette*, 601 F.2d 1217, 1220 (1st Cir.1979); H.R.Rep. No. 1453, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin. News 6351, 6355, the judge must still tread cautiously, recognizing, on the one hand, the great importance to the judicial institution of avoiding any appearance of partiality, while simultaneously remaining aware of the potential injustices that may arise out of unwarranted disqualification.

*Id.* (emphasis in original).

In *In re Allied–Signal*, the Court of Appeals for the First Circuit also identified several factors that may be relevant to determining whether an appearance of partiality requiring disqualification should be found. *Id.* at 971–72. First, it noted that, "the more common a potentially biasing circumstances and the less easily avoidable it seems, the less that circumstance will appear to a knowledgeable observer as a sign of partiality." *Id.* at 971. At this point, it appears to me that this factor is relevant in this case and militates against finding a reasonable appearance of partiality.

There are now eleven active, district judges sitting in Boston. Six have served either as the United States Attorney or as an Assistant United States Attorney during the period relevant to this case: Chief Judge Tauro, and Judges Harrington, Woodlock, Stearns, Saris, and myself. Judge Harrington also served as the Chief of the Organized Crime Strike Force during the relevant period and has already been mentioned in the testimony as an individual who worked closely with former Special Agent Rico, whose credibility is at issue. Chief Judge Tauro was the United States Attorney in 1972. Judge Woodlock was a member of the Public Corruption Unit when Mr. O'Sullivan and I were its Chiefs, and prosecuted a case for Mr. O'Sullivan's Strike Force before returning to private practice. As Mr. Crossen reportedly told the FBI, Judge Stearns was one of his superiors at the time he applied for the 1984–85 electronic surveillance. Judge Saris was the Chief of the Civil Division when Mr. Weld was the United States Attorney. In varying degrees, all of these judges probably would, like me, have at least some association with some prospective witnesses in this case and perhaps other issues concerning their ability to preside.

It is, of course, possible that if this case were randomly reassigned it would be drawn by a judge who did not serve in the United States Attorney's Office. When faced with a similar issue in *In re Allied–Signal*, where the judge's law clerks each had brothers in law firms involved in a complex mass tort case, the Court of Appeals for the First Circuit said:

> We do not say that the relationship is unavoidable; we simply say that it arises out of a common circumstance. And, a knowledgeable objective observer is therefore more likely to see the relationship as implicit in the special circumstances rather than as an odd coincidence the failure to avoid which might suggest bias.

*Id.* at 971–72. This observation also seems to also be applicable to this case.

The Court of Appeals for the First Circuit went on to state that, "the greater the extent to which the potentially disqualifying circumstance facilitates the just and efficient resolution of the case, the less likely a knowledgeable observer will consider it a sign of judicial partiality." *Id.* at 972. I understand that if my disqualification is required, it would be improper not to recuse myself because of a concern that reassignment would impede the process of this case. *See In re School Asbestos Litigation,* 977 F.2d 764, 784–85. (3rd Cir. 1992).

However, in many cases the question whether a judge should recuse himself under § 455(a) is within the range of his discretion. *In re Allied–Signal* at 970. When I am faced with such a discretionary decision at the outset of a case, absent some countervailing consideration, I usually recuse myself because the case can be easily reassigned and proceed efficiently before some judge as to whom no legitimate issue has been raised. *See, e.g., Sawyer, supra* at n. 5. If I recuse myself in this case under § 455(a), it is uncertain whether my prior rulings would be vacated or whether the case would resume where it was suspended. *Compare Liljeberg,* 486 U.S. at 862–870, 108 S.Ct. 2194 (holding that remedy for an improper failure to

recuse under § 455(a) is discretionary and finding in particular circumstances that the judgment should be vacated) *with Widgery,* 778 F.2d at 328 ("Disqualification for the appearance of impropriety runs prospectively only; even a successful motion does not vitiate actions taken before the motion was filed."), *and Murphy,* 768 F.2d at 1539 ("In cases decided under § 455(a), disqualification runs from the time the motion was made or granted."). *See also In re Allied–Signal,* 891 F.2d at 973.[15] It is clear, however, that it would, at a minimum, be challenging and time-consuming for another judge to become familiar with the three-year history of this case and the hundreds of decisions I have made in it. The defendants would probably remain detained during the pendency of the learning process.

In these circumstances, at this time it appears to me that if the issue of recusal under § 455(a) is within the range of my discretion, a decision not to disqualify myself would most likely be properly perceived as a manifestation of my commitment to the administration of justice, rather than as evidence of bias or prejudice. *See In re Allied–Signal,* 891 F.2d at 972 (finding that "the court's need for the clerks was somewhat special and likely to have been seen as such").

---

15. The government has repeatedly represented that it has raised possible issues relating to recusal to protect any convictions it may obtain from later attack by defendants on the grounds that I should not have presided, rather than from a desire to remove me from the case. The defendants have adamantly denied that this is their strategy. Indeed, they have represented that, to the maximum extent legally permissible, they wish to waive any right to challenge a conviction on this ground.

I note that a finding that a judge improperly failed to disqualify himself under § 455(b) may require that prior proceedings be reopened. *See Widgery,* 778 F.2d at 327. However, if the only basis for disqualification is under § 455(a):

[I]n determining whether a judgment should be vacated ... it is appropriate to consider the risk of injustice to the parties in the particular case, the risk that denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process.

*Liljeberg,* 486 U.S. at 847, 108 S.Ct. 2194. The above-cited decisions in *Widgery, Murphy,* and *In re Allied–Signal* suggest that in the circumstances of this case it may be difficult, if not impossible, for the defendants to have these proceedings reopened if I continue to preside and the only error later found is a failure to recuse under § 455(a).

Finally, in *In re Allied–Signal*, the Court of Appeals for the First Circuit stated that, "the parties' own words and deeds may help determine the extent to which a knowledgeable observer would see, in a particular circumstance, a sign of partiality." *Id.* Some of those words and deeds have been recited earlier in this memorandum.

My colloquy with the parties since January 20, 1998 suggests that there may be a question of what circumstances should now be considered in determining whether a reasonable person would question my impartiality. As described earlier, on several occasions—most recently and extensively on December 4, 1997—I described the facts I regarded as relevant to the issue of my possible recusal, including my prior associations with various witnesses, and encouraged the parties to ask me any questions they wished. After deliberating, the government informed me that it believed a reasonable person would, in the circumstances, question my impartiality, but the government waived any objection to my participation on this ground.

A valid waiver requires full disclosure of the basis for disqualification. § 455(e). This means, however, that "[a] judge is required merely to disclose the basis for disqualification, not 'every incident or factual detail which might contribute to the overall impression of partiality.' " *Hall v. Small Business Admin.*, 695 F.2d 175, 180 (5th Cir.1983) (quoting *United States v. Conforte*, 457 F.Supp. 641, 655 (D.Nev. 1978)). *See also United States v. Nobel*, 696 F.2d 231, 236 (3rd Cir.) (finding waiver where judge made full disclosure of the relevant facts), *cert. denied*, 462 U.S. 1118, 103 S.Ct. 3086, 77 L.Ed.2d 1348 (1983). I tried, and believe I succeeded, in making an adequate disclosure of the facts as I knew them on December 4, 1997, including those relating to my relationship with Mr.

O'Sullivan. This is, however, one of the issues the parties are welcome to address.

With regard to matters that were adequately disclosed as of December 4, 1997, I am inclined to believe that it would be inappropriate to permit the government to withdraw its waiver. I did offer all parties this option on December 11, 1997, as part of an effort to get the recusal issue authoritatively resolved before I had to make a series of decisions that I anticipated would be disappointing to someone.

If parties were permitted to withdraw valid waivers after judicial decisions have been made both the efficacy of the judicial process and public confidence in it would be injured. Regrettably, it is a fact of life that "[i]n the real world, recusal motions are sometimes driven more by litigation strategies than by ethical concerns." *In re Cargill, Inc.*, 66 F.3d 1256, 1262 (1st Cir. 1995). As described earlier, in December 1997 I explored the question of my possible disqualification primarily to determine if I could properly continue to preside in this case. I was, however, also seeking to minimize the risk that there would later be an opportunity for any party to use a recusal motion "as a tactic to jettison an impartial judge whose slant on a case, as evidenced by his rulings, jeopardize[d] a parties' chances for ultimate success," *id.* at 1263, or even to appear reasonably to be doing so. The withdrawal of valid waivers, and subsequent recusals and reassignments, would obviously, at a minimum, inject inefficiency into the administration of justice. Moreover, if judges felt that valid waivers of disqualification could be withdrawn after they made difficult decisions, they might be inhibited in making the honest judgments their office requires. If the public understood that this could occur, its confidence in the administration of justice would be impaired. Thus, I continue to believe that generally the dis-

covery of a new fact regarding possible recusal should not operate to revive grounds for recusal that have been waived.

The defendants, however, may have a stronger argument for withdrawing their waivers than the government. On December 4, 1997, they first stated that my disqualification was not required under § 455(a) because they believed that a reasonable person would not question my impartiality. Accordingly, in their view, no waiver was necessary. Nevertheless, they provided the waivers I viewed as prudent to solicit. Thus, they might conceivably contend that when the information previously disclosed is added to the recent disclosures, there is now, for the first time, a situation in which a reasonable person would question my impartiality and, therefore, argue that this is the first time that a waiver can be properly received from them.

In view of the defendants' representations, I doubt it will be necessary for me to decide this issue. However, if any of the parties wish to make any arguments concerning the validity or implications of their prior waivers, I will consider them seriously.

In any event, the disclosures I have made since January 20, 1988 present new information for the parties and me to consider. I have, as requested by the government, thought further about this matter and issued this memorandum to present my more considered, but not final views.

At this point it appears to me that it may be debatable whether a reasonable person, fully informed of all of the relevant facts, would question my impartiality, but that this issue is at least within the range of my discretion to decide. I am inclined to find that a reasonable person would not question my impartiality. If this is a permissible and appropriate conclusion, I am inclined to continue to preside in order to facilitate the efficient progress of this case, rather than to recuse myself as I often, but not always, do when a legitimate issue of disqualification is raised at the outset of a case.

As stated earlier, I am interested in the parties' positions on these issues, among others. If the parties view this as a close question on which I have legitimate discretion, I want their advice on how to exercise that discretion. I also want to know whether if the only issue is a possible appearance of partiality—rather than any actual impediment to my ability to preside fairly—they again wish to waive this ground for my disqualification.

## IV. *Order*

Accordingly, it is hereby ORDERED that:

1. The government shall, by February 19, 1998:

(a) With regard to 28 U.S.C. § 455(b), state whether it believes my recusal is required and, if so, describe with specificity the reasons for that belief, including, if applicable, any disputed evidentiary fact of which it is believed I have personal knowledge.

(b) With regard to 28 U.S.C. § 455(a), state whether (i) it believes a reasonable person could question my impartiality; (ii) it believes that reasonable minds could differ on this issue and, therefore, I have the legitimate discretion to decide it either way; (iii) if so, how I should exercise that discretion; and (iv) in any event, whether it wishes to waive again, pursuant to § 455(e), any claim that I should disqualify myself because a reasonable person would question my impartiality.

(c) File a memorandum in support of its position if it is advocating my disqualification.

2. The defendants shall, by February 26, 1998, address the same issues and respond to the government's submission.

3. If necessary to resolve the question of my possible recusal, a hearing will be held on March 3, 1998, at 9:30 a.m.